UNITED STATES of America,
Plaintiff-Appellee,

v.

Louis IRONS, Defendant-Appellant.

No. 80–1478.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 10, 1980.

Decided Feb. 4, 1981.

Rehearing En Banc Denied April 13, 1981.

Leo E. Holt, Harvey, Ill., for defendant-appellant.

Joseph H. Hartzler, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before PELL and CUDAHY, Circuit Judges, and DUMBAULD, Senior District Judge.*

CUDAHY, Circuit Judge.

Defendant-appellant Louis Irons seeks review of his conviction on two counts of violating the federal conflict of interest law, 18 U.S.C. § 208(a).[1] Each count charged that Irons, an Education Program Officer for the Department of Health, Education and Welfare ("HEW"), personally and substantially participated in a contract and matter between HEW and Advance Photo and Sounds ("APS"), a company in which he had a personal financial interest.[2]

---

* The Honorable Edward Dumbauld, Senior District Judge of the United States District Court for the Western District of Pennsylvania, is sitting by designation.

1. 18 U.S.C. § 208(a) provides:

Except as permitted by subsection (b), whoever, being an officer or employee of the executive branch of the United States Government, of any independent agency of the United States, or of the District of Columbia, including a special government employee, participates personally and substantially as a Government officer or employee through decision, approval, disapproval, recommendation, the rendering of advice, investigation or otherwise in a judicial or other proceeding, application, request for ruling or other determination, contract, claim, controversy, charge, accusation, arrest or other particular matter in which to his knowledge, he, his

spouse, minor child, partner, organization in which he is serving as an officer, director, trustee, partner or employee of any person or organization with whom he is negotiating or has any arrangement concerning prospective employment, has a financial interest—shall be fined not more than $10,000 or imprisoned not more than two years or both.

2. Count One charged in relevant part:

From in or about September 1973 to in or about January 1975, . . . Louis Irons, . . . knowingly participated personally and substantially as a Government employee through recommendation, the rendering of advice, causing delivery to be made of equipment, receiving payment of monies for such equipment and otherwise in a contract and matter between Enrichment Learning, a program of the Department of Health, Education and Welfare and Advance Photo and Sounds,

Prior to trial, Irons moved to quash the indictment on the grounds that prosecution was barred by the statute of limitations. 18 U.S.C. § 3282.[3] He argued that the Government had attempted to extend the five year limitations period by padding the indictment with charges which fell outside of the conduct proscribed by the statute. The district court denied the motion and found Irons guilty on both counts following a bench trial on stipulated facts. Irons appeals his conviction. We affirm.

## THE FACTS

### I. The Enrichment Learning Contract

In late 1973, Irons was employed as an Education Program Director for the Department of Health, Education and Welfare with supervisory responsibility over several educational programs funded by HEW including "Enrichment Learning," "Vision," and "Fellowship for Action."[4] He was authorized to advise, assist and recommend action to the directors of projects which he supervised, particularly in the formation of program budgets.

Ken Tatum, project director for Enrichment Learning, met with Irons in December 1973, to discuss the program's proposed budget for the following school year. Tatum had allocated a sum of money for the purchase of audio-visual equipment. Irons advised Tatum that he would need more than he had specified, and the budget was subsequently amended to provide for the additional amount. In April 1974, HEW awarded Enrichment Learning a grant of $183,000, which included approximately $13,000 for audio-visual equipment.

Tatum then sent out letters to various companies soliciting bids for the equipment. At the suggestion of Irons, one letter was addressed to Fred Bronaugh of Advance Photo and Sounds. Tatum did not know that prior to this time APS had never done business as an audio-visual supplier, or that Bronaugh, a long-time friend of Irons, had never been involved in the audio-visual equipment business and did not own any interest in the company.[5] The APS business address furnished to Tatum was, in fact, the basement of a residential building owned by Irons' father and served only as a storage facility.

APS submitted a bid to Enrichment Learning on July 2, 1974, but Tatum was forced to solicit additional bids after all of the initial responses were too high. Prior to receiving a second bid from APS, Irons approached Tatum and questioned him about the status of the audio-visual equipment purchase. On September 3, 1974, Tatum accepted APS' second bid for the contract.

Tatum, anxious to obtain the equipment, decided to deliver the letter of acceptance in person. When he arrived at the APS address, he was directed to a funeral home where he found both Bronaugh and Irons. Tatum indicated he needed the equipment as soon as possible and agreed to pay for it in advance of delivery. Bronaugh instructed Tatum to leave a check for $12,855 at Irons' home. Bronaugh deposited this check in the APS account on September 5, 1974. One week later, Bronaugh wrote an APS check to Irons in the amount of $10,800. Irons purchased the Enrichment Learning audio-visual equipment from a

Chicago Heights, in which company, to his knowledge, he had a financial interest.
Count Two contained identical wording except that the crime was alleged to have occurred "[f]rom in or about April 1974, to in or about January 1975" and the contract or matter involved was the Vision contract.

3. 18 U.S.C. § 3282 provides:
    Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is

instituted within five years next after such offense shall have been committed.

4. Although the Government claims that the evidence established that Irons violated Section 208 by obtaining business for APS from Fellowship for Action, Irons was not indicted for his alleged participation in that contract. Gov't. Br. at 6.

5. Bronaugh was employed on a full-time basis as an assistant to the director of a funeral home.

supplier in Hinsdale, Illinois, on September 13, 1974, and Tatum picked up the equipment at Irons' home several weeks later. At the time of these activities, Tatum did not know that Irons was associated with APS.[6]

## II. The Vision Contract

Irons' supervisory responsibilities as Education Program Director also extended to Vision, a mathematics and reading skills improvement program for school age children. In May of 1974, Elizabeth Jackson, director of Vision, sought Irons' advice on the disposition of a fiscal year budget surplus. Irons, who regularly reviewed Vision funding proposals, recommended that Jackson purchase audio-visual equipment and suggested to her that Bronaugh could give her a good price. On the basis of Irons' recommendation, Jackson ordered $3,120 worth of audio-visual materials from APS on May 14, 1974. The equipment was delivered on August 28, 1974, and Jackson gave Irons a check for the proper amount on the following day. After this Vision check had been deposited into the APS account, Bronaugh gave Irons a check drawn on the APS account for $2,800. At the time of these events, Jackson did not know that Irons had any connection with APS.

## THE ISSUE

Irons was indicted on August 29, 1979, for violating the federal conflict of interest law which forbids

> an officer or employee of the executive branch of the United States Government [or] of any independent agency of the United States ... [from] participat[ing] personally and substantially as a Government officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation or *otherwise* in a judicial or other

proceeding, ... contract ... or other particular matter in which, to his knowledge, he ... has a financial interest.

18 U.S.C. § 208(a) (Emphasis supplied). The indictment contained two counts focusing on Irons' activities in the Enrichment Learning contract and the Vision contract respectively. Irons moved to quash the indictment on the grounds that prosecution was barred by the statute of limitations. Count One of the indictment[7] charged, in relevant part:

> From in or about September 1973, to in or about January 1975, ... Louis Irons ... knowingly participated personally and substantially as a Government employee through recommendation, the rendering of advice, *causing delivery to be made of equipment, receiving payment of monies for such equipment, and otherwise*, in a contract and matter between Enrichment Learning, ... and Advance Photo and Sounds, ... in which company, to his knowledge, he had a financial interest. [Emphasis supplied.]

Under Irons' interpretation of § 208(a), the Government may only prosecute employees who participate in precontractual activities such as "decision, approval, disapproval, recommendation, the rendering of advice, [or] investigation." *See* 18 U.S.C. § 208(a). Irons contends that any activity which could constitute a violation of the statute occurred prior to July 1, 1974, so that the indictment, returned on August 29, 1979, was not timely filed. Irons claims that the Government additionally and improperly charged him with "causing delivery to be made of equipment" and "receiving payment of monies for such equipment" merely to bring the case within the five year statute of limitations. These acts charged in Count I, completed in September of 1974, are not, under defendant's theory, pro-

---

6. When Tatum was subpoenaed by a grand jury in January 1978, to testify about this transaction, Irons asked Tatum not to reveal that Irons recommended Bronaugh, or that Tatum delivered the check or picked up equipment at Irons' home.

7. The wording of Count Two is identical except for the initial and terminal dates (April 1974 and January 1975, respectively) and the contracting party (Vision, instead of Enrichment Learning). Although this analysis focuses only on Count One, similar principles are applicable to Count Two.

scribed by the statute and are "not necessary to the offense" which consists solely of a breach of duty or "abandonment of fidelity" to the government. Def.Br. at 19.

The Government responds to this argument by stating that Irons' activities involved several criminal acts, which were either specifically proscribed by the statute[8] or included in the provision's catchall language. The statute proscribes participation in a contract involving a conflict of interest through "decision, approval, disapproval, recommendation, the rendering of advice, *or otherwise.*" 18 U.S.C. § 208(a) (Emphasis supplied). Irons was indicted for "causing delivery to be made of equipment [and] receiving payment of monies for such equipment" in addition to "rendering advice and making recommendations." Irons claims that the activities involving delivery and payment are outside the specific statu-

tory prohibitions and not properly included within the "or otherwise" language of the provision. Thus, the issue presented here is whether the acts of "causing delivery to be made of equipment" and "receiving payment of monies for such equipment" are properly charged under the language of the statute as acts of proscribed participation in a contract involving a conflict of interest. The resolution of this question depends upon the interpretation given to the phrase "or otherwise" as it appears in the statute.[9]

Irons' argument, as we interpret it, urges, *inter alia,* a narrow application of the rule of *ejusdem generis* to the statutory phrase "or otherwise." Under this principle of statutory construction, the scope of a general term in a statute is limited by the nature of the preceding class or thing (in this case matters generally preliminary to

---

**8.** As an alternative theory, the Government argues that Irons' activities with Enrichment Learning and Vision constitute two separate criminal schemes which involved continuous courses of dealing over extended periods of time. Gov't. Br. at 9. The acts of delivering goods and accepting payment were, therefore, part of a "single continuous pattern of illegal activity," and as subsequent manifestations of the criminal act of "participating" in contracts in which Irons had a conflict of interest, were appropriately considered part of the "unit of prosecution" for statute of limitations purposes. See *United States v. Provenzano,* 334 F.2d 678 (3d Cir.), *cert. denied,* 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964). In view of our interpretation of the "or otherwise" language in the statute and the Government's ultimate position (upon supplemental briefing) that the acts of delivering equipment and receiving payment of money are criminal in and of themselves, Gov't. Supp. Br. at 16, it is not necessary at this time to determine the applicability or implications of a continuous offense theory to Section 208(a) violations. We see no reason, however, to take issue with the Government's selection of each contract as an appropriate "unit of prosecution."

**9.** The dissent seems to suggest that the scope of participation proscribed by the statute is irrelevant if Irons was not acting in his capacity as a government employee at the time of the disputed acts. Thus, Judge Dumbauld speculates that Irons was acting as an agent of APS (and not in his role as an HEW supervisor) when he held the audio-visual equipment for delivery and accepted payment of the amount due on the contract. We believe, however, that the district court's guilty verdict implicitly in-

volves a determination that the Government had presented evidence sufficient to prove every element of the crime (including participation *as a government employee*) beyond a reasonable doubt. This determination finds ample support in the evidence. Generally, a government employee acts on behalf of the Government whenever he is performing the duties and functions of his office. *United States v. Birdsall,* 233 U.S. 223, 34 S.Ct. 512, 58 L.Ed. 930 (1914). Irons' duties as Education Program Officer included "the giving of advice and assistance to directors of projects such as Enrichment Learning, Vision and Fellowship for Action." Stipulation of Facts at 1. By facilitating the delivery of the equipment and receiving payment, Irons was, in significant part at least, acting in his capacity as a government employee to assist the program directors in obtaining materials for their respective projects. Neither Tatum nor Jackson knew that Irons was associated with APS, and Irons agreed that Tatum would not have given APS the contract if Tatum had been aware of Irons' personal involvement. Stipulation of Facts at 6. Similarly, neither Tatum nor Jackson would have given Irons a check for the equipment unless they believed that Irons was acting in his role as an HEW supervisor responsible for assisting them in purchasing equipment necessary for their programs. Therefore, although Irons arguably may have been acting at the same time in his private capacity to enrich himself, he was nonetheless acting in his capacity as a government employee in the course of the various acts charged in the indictment. This very duplexity is inherent in his conflict of interest.

the formation of the contract) unless a contrary intent is clearly shown. *United States v. Baranski*, 484 F.2d 556, 566 (7th Cir. 1963). The rule has been applied in a number of contexts to interpret the phrase "or otherwise." [10] We find it appropriate here, in order to preserve the meaning which Congress intended for Section 208, to construe the statutory phrase "or otherwise" in a realistic and relatively inclusive fashion.

This conclusion rejects a formalistic application of *ejusdem generis.* The rule is intended only as an aid to ascertainment of legislative intent when uncertainty or ambiguity exists. The Supreme Court, in considering the application of this rule to determine the meaning of the phrase "or otherwise" in a criminal statute, emphasized that, "[*Ejusdem generis*] may not be used to defeat the obvious purpose of legislation. And, while penal statutes are narrowly construed, this does not require rejection of that sense of the words which best harmonizes with the content and the end in view." *Gooch v. United States*, 297 U.S. 124, 128, 56 S.Ct. 395, 80 L.Ed. 522 (1936). *See United States v. Hartwell*, 6 Wall. 385, 395, 18 L.Ed. 830 (1868).

The legislative history of Section 208 demonstrates an intention to proscribe rather broadly employee participation in business transactions involving conflicts of interest and to reach activities at various stages of these transactions, including those activities specifically enumerated. For almost one hundred years, the predecessor conflict of interest statutes to Section 208 proscribed participation by a government employee in the "transaction of business" with an entity in which the employee held a personal financial interest. *See* 12 Stat. 696, 698 (1863), as amended, 35 Stat. 1088, 1097 (1909), as amended, 62 Stat. 683, 703 (1948), as amended, 76 Stat. 1119, 1124 (1962). *See generally* B. Manning, *Federal Conflict of Interest Law* (1964); Perkins, *The New Federal Conflict of Interest Law,*

76 Harv.L.Rev. 1113 (1963). Section 208 (the current version of the statute) was enacted with the purpose of *broadening* rather than narrowing the scope of the covered business activity to include precontractual or preliminary activities such as recommendations or investigations as well as more easily identifiable acts of transacting business.

Section 208 was enacted in 1962 primarily to correct the perceived inadequacies of its predecessor, 18 U.S.C. § 434. Section 434 provided:

> Whoever, being an officer, agent or member or directly or indirectly interested in the pecuniary profits or contracts of any corporation, joint stock company or association or of any firm or partnership or other business entity, is employed or acts as an officer or agent of the United States for the *transaction of business* with such business entity, shall be fined not more than $2000 or imprisoned not more than 2 years or both. [Emphasis supplied.]

Termed "the most crystallized expression of the concept of conflict of interest," [11] Section 434 was distinguished from other federal ethics provisions by its technique of regulation. Rather than restricting the activities of the government employee outside of his official duties, it limited the activities of the employee in his official capacity and was frequently termed a disqualification statute. The Association of the Bar of the City of New York, *Conflict of Interest and Federal Service,* 43 (1960) [hereinafter "New York Bar Report"]. The section did not prevent government employees from investing or maintaining economic interests in private business. It only prevented "an officer of the United States from *transacting business* with a corporation in such a way that his action might result in direct or indirect personal pecuniary benefit of the officer." 40 Ops.Att'y Gen. 168 (1942) (Emphasis supplied). The statutory use of the term "transaction of business," however,

---

**10.** *See* 82 C.J.S. Statutes, § 332b at p. 662.

**11.** The Association of the Bar of the City of New York, *Conflict of Interest and Federal Service,* 43 (1960).

evinced an intent to reach official acts by way of execution of a contract involving a conflict of interest.

Section 434 was examined in a 1958 study of the federal conflict of interest laws commissioned by the House Committee on the Judiciary. The committee report indicated that "consideration should be given to broadening the prohibition of 'transacting business with' entities in which the employee has an interest to include advising and recommending with respect to the Government's business with such entities." U. S. Congress, House Committee on the Judiciary, Subcommittee No. 5, *Federal Conflict of Interest Legislation*, 85th Cong., 2d Sess. 42 (1958). This recommended expansion in scope sought to bring in acts which *led up to* the formation of the contract as well as those (already covered) which might be performed in the execution of the contract.[12]

In early 1960, the Association of the Bar of the City of New York completed its review of the federal conflict of interest laws. The Bar's report also highlighted the "unsatisfactory aspects of § 434":

> ... [I]t applies only to one acting as an officer or agent of the Government in dealing with the outside concern. The statute, as written, therefore, reaches only the front, or contact man, and has no apparent application to require an interested official to disqualify himself from participating in the transaction in other ways, as by advice or investigation.

New York Bar Report at 199. In recommending a major revision of the federal conflict of interest laws, the Bar committee suggested that participation in the transaction of business be redefined to include participation through "approval, disapproval, decision, recommendation, the rendering of advice, investigation or otherwise." *Id.* at 273. This very language would eventually find its way into Section 208. The Bar group emphasized however, that its definition only gave examples of what might constitute participation and was not intended to contain a definitive or exhaustive list.

While Congress was considering the need for change in the conflict of interest laws, the Supreme Court in *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961), gave the broadest possible interpretation to Section 434:

> Congress has drafted a statute which speaks in very comprehensive terms. *Section 434 is not limited* in its application to those in the highest echelons of government service or to those government agents who have only a direct financial interest in the business entities with which they negotiate on behalf of the Government or *to a narrow class of business transactions* .... Rather, it applies, without exception, to 'whoever' is 'directly or indirectly interested in the pecuniary profits or contracts' of a business entity with which he *transacts any business* 'as an officer or agent of the United States.'

*Id.* at 549, 81 S.Ct. at 309 (Emphasis supplied). The Court ultimately held that the

---

12. The House Committee on the Judiciary initially considered two bills which contained revised versions of Section 434. Both bills specifically prohibited government employees from negotiating and *executing* government contracts in which they had a personal financial interest. The relevant section of these identical bills provided:

> Whoever, being an officer, agent ... or member of ... any ... business entity, is employed or acts as an officer or agent of the United States, or any agency for recommending or taking action with respect to any individual application to the government for relief or assistance, on appeal or otherwise, made by such business entity, or *for negotiating or executing any Government contract* or

in any other manner transacting business with such business entity shall be fined.... H.R. 1900 and H.R. 2156, 86th Cong., 2d Sess. § 208 (1960) *reprinted in Federal Conflict of Interest Legislation: Hearings on H.R. 1900, H.R. 2156, H.R. 2157, H.R. 7556 and H.R. 10575 Before the Antitrust Subcomm. of the House Comm. on the Judiciary*, 86th Cong., 2d Sess. 5, 9 (1960) (Emphasis added). Although the terms "negotiating" and "executing" were ultimately eliminated in preference for the broader term "participate," we believe the legislative history is replete with evidence which manifests an intent to proscribe participation whether in the form of the negotiation or of the execution of a contract involving a conflict of interest.

"transaction of business" language contained in Section 434 reached precontractual activities such as the rendering of advice or the making of recommendations. Based on the statutory reference to the "transaction of business" and the Court's broad construction of that term, there can be little doubt that acts by way of execution of contracts involving conflicts of interest were deemed to be covered as a matter of course.

Notwithstanding the Supreme Court's expansive reading of Section 434, Congress replaced it with Section 208 in 1962. The intended broad scope of Section 208 is emphasized in passages from both the House and Senate Reports. The House Report explained:

> Section 208 supplants 18 U.S.C. § 434 which disqualifies government officials who are pecuniarily interested in business entities from transacting business with such entity on behalf of the Government. *Section 208(a) would prohibit not merely 'transacting business' with a business entity in which the government employee is interested but would bar any significant participation in government action in the consequences of which to his knowledge the employee has a financial interest.*

H.R.Rep.No.748, 87th Cong., 1st Sess. 24 (1961) (Emphasis supplied). Similarly, the Senate Report noted:

> . . . [S]ubsection (a) improves upon the present law [§ 434] by *abandoning the limiting concept of the 'transaction of business.' The disqualification of the subsection embraces any participation* on behalf of the Government in a matter in which the employee has an outside financial interest, even though his participation does not involve the transaction of business.

S.Rep.No.2213, 87th Cong., 1st Sess. (1961) *reprinted in* [1962] *U.S.Code Cong. & Ad. News* 3852, 3862 (Emphasis supplied).

Thus, the legislative history could not be more persuasive in suggesting that, while the former § 434 covered the "transaction of business" including acts performed by way of execution of a contract involving a conflict of interest, the new Section 208 was explicit in addressing prior or more remote acts of advice or investigation.

Although Irons correctly notes that penal statutes are to be strictly construed, the Supreme Court has repeatedly held that penal statutes must be "given their fair meaning in accord with the evident intent of Congress." *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 550, 81 S.Ct. 294, 309, 5 L.Ed.2d 268 (1961); *United States v. Raynor*, 302 U.S. 540, 552, 58 S.Ct. 353, 358, 82 L.Ed. 413 (1937). The most recent court to interpret the terms of Section 208 concluded that a broad reading was necessary to effectuate the legislative purpose. *United States v. Conlon*, 628 F.2d 150 (D.C.Cir., 1980). We decline to adopt an inappropriately narrow interpretation of Section 208 which would apparently distort Congressional intent. Therefore, we conclude that the "or otherwise" language of Section 208 includes acts which execute or carry to completion a contract or matter as to which the acts of rendering advice or making recommendations are specifically proscribed. But we emphasize that the instant case and the instant holding go no farther than these facts, where execution and completion follow in normal time sequence from the other phases of the transaction.[13]

We reject Irons' suggestion that this interpretation of Section 208 would render the statute unconstitutionally vague. The purpose of a strict construction of penal statutes is to insure that potential offenders receive fair notice of the scope of criminal proscription. *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973). In light of the

---

**13.** The dissent suggests that our reading of the statute would allow the Government to prosecute Irons if he repaired the equipment ten years later. We note, however, that in a simple contract for the sale of goods, the principal acts which comprise execution of the contract are delivery and acceptance of the goods and payment for them. We interpret the "or otherwise" language of Section 208 to include these acts and do not address more remote activities resulting from ancillary claims allegedly based on the contract.

legislative history and the ordinary expectations of persons burdened with a conflict of interest, no one could reasonably believe that it was illegal to recommend a contract but not illegal to help carry it out. *See United States v. Nassar,* 476 F.2d 1111 (7th Cir. 1973).

Since Irons was properly charged and convicted of criminal conduct which continued beyond August 29, 1974, the indictment was timely filed, and the conviction must be affirmed.

DUMBAULD, Senior District Judge, dissenting:

It is plain that appellant violated 18 U.S.C. 208, which provides that "whoever, being an officer or employee of the ... United States Government ... participates personally and substantially as a Government officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise ... in a matter in which, to his knowledge, he ... has a financial interest" is guilty of a criminal offense. He induced an educational program of HEW, of which he was regional supervisor, to buy audio-visual equipment from an undertaker associated with him in purchasing elsewhere the equipment recommended and reselling it to the HEW program.

However, in my opinion, his criminal conduct was perpetrated more than five years before the indictment was returned on August 29, 1979, and prosecution is thus precluded by the statute of limitations (18 U.S.C. 3282).

The crime was complete when appellant recommended the purchase of equipment from his firm. He would have been guilty even if his subordinate had rejected his suggestion and had purchased from a competitor. His subsequent actions in delivering merchandise or collecting payment (which the Government relies on to avoid the statute of limitations) might perhaps be regarded as acting (under the other hat of his conflicting capacities) as agent of the seller rather than "as a Government officer or employee" on behalf of the buyer. In any event such action is not an element of the crime as defined by Congress. If the equipment broke down ten years later, and appellant repaired it, such conduct would hardly be thought adequate to serve as a basis for prosecution at that late date; but the reasoning of the majority of the panel would lead to that result.

The words "or otherwise" should be interpreted under the rule of *ejusdem generis.* They obviously refer to other modes of exerting influence or pressure upon the government agency to favor the seller in which appellant has a financial interest. They do not include within the crime mere ministerial conduct on the part of the seller in performing a contract. The majority opinion places on those two words a burden heavier than they can support.

Legislative history offers no support for the majority position. We are not confronted with the question whether appellant's conduct would have violated the former legislation, 18 U.S.C. 434, making criminal the action of a person with a pecuniary interest in a business entity who "is employed or acts as an agent of the United States for the transaction of business with such business entity." [1] For Congress repealed § 434 when it enacted § 208 in 1962. It is of course true that the purpose of Congress in enacting § 208 was to make criminal preliminary actions which might not amount to actual "transaction of business," to punish one acting "behind the scenes" as well as the "front man." But since the language of § 434 was replaced by that of § 208, it is the current wording which governs and controls the case at bar.

Nor are we confronted with a charge of conspiracy, under the general conspiracy statute, 18 U.S.C. 371, between appellant and his associate to violate § 208. The delivery of goods and receipt of payment might well constitute overt acts in further-

---

**1.** That legislation was broadly interpreted in the Dixon-Yates affair, *U. S. v. Mississippi Val-* *ley Generating Co.,* 364 U.S. 520, 524, 548–53, 81 S.Ct. 294, 304, 5 L.Ed.2d 268 (1961).

ance of such a conspiracy.[2]  But appellant was not indicted for conspiracy, and it is an elementary principle of our law that a defendant cannot be convicted of a crime with which he is not charged.  *Stirone v. U. S.*, 361 U.S. 212, 217, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).  Perhaps, to paraphrase Cardozo's famous aphorism,[3] a guilty man here would go free because the draftsman of the indictment blundered in failing to allege conspiracy; but under the language of § 208 effect should be given to the salutary policy of repose which Congress embodied in the statute of limitations.[4]

I respectfully dissent.

2. See *U. S. v. Payne*, in this Court, 635 F.2d 643.

3. "The criminal is to go free because the constable has blundered." *People v. Defore*, 242 N.Y. 13, 21, 150 N.E. 585 (1926), quoted in *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 at 413, 91 S.Ct. 1999, 2013, 29 L.Ed.2d 619.

4. Likewise, a court should have no qualms about letting a guilty defendant go free, because of the lapse of time, when Congress has, under the Speedy Trial Act, 18 U.S.C. 3161 *et seq.*, prescribed that result in cases where court congestion prevents his trial within the time limits set forth in the legislation.