**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

JANE G. SELBY,
*Defendant-Appellant.*

No. 07-30183

D.C. No.
CR 05-234-BR

ORDER AND
OPINION

Appeal from the United States District Court
for the District of Oregon
Anna J. Brown, United States District Judge, Presiding

Argued and Submitted
May 6, 2008—Portland, Oregon

Filed February 9, 2009

Before: Richard C. Tallman and Richard R. Clifton,
Circuit Judges, and Edward R. Korman,* District Judge.

Per Curiam Opinion

---

*The Honorable Edward R. Korman, Senior United States District
Judge for the Eastern District of New York, sitting by designation.

## COUNSEL

Per Olson, Hoevet, Boise & Olson, P.C., Portland, Oregon, for the appellant.

Karin J. Immergut, United States Attorney, and Kelly A. Zusman, Assistant United States Attorney, Portland, Oregon, for the appellee.

## ORDER

The Opinion previously filed on January 15, 2009 is withdrawn, and the Opinion filed with this Order is filed in its stead.

**OPINION**

PER CURIAM:

Jane Selby, a former official of the Bonneville Power Administration ("BPA") appeals her jury conviction for honest services wire fraud, in violation of 18 U.S.C. § 1343; making false claims and statements, in violation of 18 U.S.C. § 1001; and felony conflict of interest, in violation of 18 U.S.C. § 208. Selby contends the district court erred by denying her motions for judgment of acquittal because the evidence was insufficient to convict. We affirm the district court's decision.

I

Jane Selby held a significant administrative position at the BPA, a federal agency which produces and transmits power throughout the Pacific Northwest. She was one of three "Tier 3 managers" in the Transmission and Marketing Division and appears to have been the most trusted of the three by her supervisor, Charles Meyer, BPA's Vice President of Transmission and Sales. At the time of the events at issue here, Meyer had assigned Selby to a special detail to determine why various information technology projects were behind schedule and over budget, and to work alongside other Tier 3 managers in the department to help complete the projects. Selby's assignment was to help manage the transition to the new computer system, along with Mark Reynolds, the Tier 3 manager in charge of BPA's information technology staff, and Lorie Hoffman, the Tier 3 manager in charge of the transmission scheduling staff. Selby also served as acting Vice President when Charles Meyer was away.

Jane Selby is married to Scott Selby. In March 2002, Scott Selby was hired as a salesman by a software company called Knowmadic, Inc., during the time it was seeking to expand the scope of an existing agreement to sell software ("ASCI"

or "ASCI/CWI") to BPA. Jane Selby had approached Know-madic's Vice President about hiring her husband, telling him that Scott was "very computer literate and savvy. And that he had been unemployed for quite a long time, and was looking for a job." Knowmadic then hired Scott and assigned him to the BPA account to work on-site at BPA's Vancouver, Washington, office. Scott earned a base salary plus commissions. His duties included the sale of Knowmadic products to BPA and persuading other public power customers to sign up to use the ASCI system.

BPA and Knowmadic entered into an initial agreement on May 11, 2001, for the purchase of ASCI software. Jane Selby was not involved in the negotiations for this initial procurement agreement. However, she subsequently promoted extensive additional use of Knowmadic's software and participated in the decision-making process to implement further use of Knowmadic's products. This activity led to her indictment for violating 18 U.S.C. § 208, which prohibits covered federal employees from certain kinds of participation in the decision-making process on federal contracts or matters in which the employee or her spouse as a financial interest, and related counts of wire fraud in violation of 18 U.S.C. § 1343, making a false statement during the course of an inspector general investigation of her conduct in violation of 18 U.S.C. § 1001, and witness tampering in violation of 18 U.S.C. § 1512.

A jury in the United States District Court for the District of Oregon returned a guilty verdict on the conflict of interest, wire fraud, and false statement counts, and a not guilty verdict on the witness tampering count. Selby was sentenced to five years probation on each count of conviction. On appeal, she challenges the sufficiency of the evidence on each of the three counts.

## II

The district court had jurisdiction under 18 U.S.C. § 3231. We have appellate jurisdiction under 28 U.S.C. § 1291. We

review de novo whether sufficient evidence exists to support a conviction where the defendant moves for acquittal at the close of the government's evidence. *See United States v. Stewart*, 420 F.3d 1007, 1014 (9th Cir. 2005). Sufficient evidence exists when, "viewing the evidence in the light most favorable to the prosecution, [a] rational trier of fact could have found the elements of [each of] the crime[s] proved beyond a reasonable doubt." *United States v. Bailon-Santana*, 429 F.3d 1258, 1262 (9th Cir. 2005).

## III

**[1]** We first address Selby's claim that the evidence was insufficient to support her conviction under 18 U.S.C. § 208.

Under 18 U.S.C. § 208(a), it is unlawful for an executive branch employee to participate "personally and substantially . . . through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise" in a "contract, claim, controversy . . . or other particular matter," with the knowledge that she or her spouse has a financial interest in the matter. At issue here is the scope of conduct proscribed by the statute. Selby contends her conduct related to the ASCI project did not fall within the scope of conduct contemplated by the statute. Specifically, she contends that the evidence was insufficient to establish that she participated substantially in the ASCI project, or that she knowingly or willfully violated the law. We consider the scope of each of these elements of the offense in light of the evidence adduced at trial supporting the verdict.

### A.   *Substantial Participation*

Selby argues that § 208 does not apply because her participation with the ASCI project occurred "post-procurement, *i.e.*, after BPA had signed a contract with Knowmadic and after BPA had committed itself financially to the endeavor." Because her conduct "occurred during the implementation of

the ASCI project, and had nothing to do with contracting, invoicing, or the taking of delivery of goods and services," she argues that the type of activity in which she engaged was "not proscribed by the statute." The statute is broader than the narrow interpretation Selby urges upon us.

**[2]** We have not previously considered the precise scope of § 208's "participation" requirement. In *United States v. Irons*, 640 F.2d 872 (7th Cir. 1981), the Seventh Circuit undertook an extensive analysis of the legislative history of 18 U.S.C. § 208, and concluded that it "demonstrates an intention to proscribe rather broadly employee participation in business transactions involving conflicts of interest and to reach activities at various stages of these transactions . . . [The scope of 18 U.S.C. § 208 includes] acts which [lead] up to the formation of the contract as well as those . . . which might be performed in the execution of the contract." *Id.* at 877. We adopted much of this analysis in *United States v. Jewell*, 827 F.2d 586 (9th Cir. 1987),[1] where we explained:

> the import of the Seventh Circuit's statement is clear: liability for conflict of interest may be founded on a variety of acts leading up to the formation of a contract even if those acts are not specifically mentioned in the text of section 208(a). The section's "catch all" language ("participates . . . through decision, approval, recommendation, the rendering of advice, investigation, *or otherwise*. . . .") was designed to allow prosecution on the basis of any type of action taken to execute or carry to completion a contract.

*Id*. at 587 (emphasis in original).

---

[1]In *Jewell*, we held that separate acts of participation did not support separate counts of liability, but did not consider which acts fell within the statute. 827 F.2d at 588.

**[3]** We reiterate our agreement with the Seventh Circuit. The wording Congress chose is broader than the narrow interpretation Selby urges. We hold that where, as here, an employee suffers from a conflict of interest, liability may lie for actions taken after the initial procurement is authorized. Where Selby continued to actively participate in BPA's internal agency deliberations leading up to its decisions to expand the scope of the work to be done by Knowmadic, and where Selby continued to recommend or urge co-workers to recommend expansion of the contract, and the result was additional procurement resulting in additional sales commissions to be paid to her husband, Selby violated § 208.

This broad reading of § 208 comports with our sister circuits' approach to this statute. The Fifth Circuit, in *United States v. Nevers*, 7 F.3d 59, 61-62 (5th Cir. 1993), examined the legislative history of § 208 and concluded Congress had intended to correct the "fundamentally defective" predecessor statute, which "allow[ed] public officials to engage in a large number of activities which were wholly incompatible with the duties of public office" by broadening the provision to embrace "*any* participation on behalf of the Government in a matter in which the employee has an outside financial interest." *Id.* at 62 (emphasis in original). The Seventh Circuit in *Irons* confirms this reading of the statutory history, concluding the revised § 208 "was enacted with the purpose of broadening rather than narrowing the scope of covered business activity." *Id.* at 876. It rejected the contention that the statutory language limited its applicability to "matters generally preliminary to the formation of the contract." *Id.*

Selby claims the Sixth Circuit's approach in *United States v. Ponnapula*, 246 F.3d 576 (6th Cir. 2001), would preclude liability here because that circuit interpreted the phrase "personally and substantially" to exclude employees "performing purely ministerial or procedural duties." Specifically, the Sixth Circuit held that an attorney hired by the government to act as the trustee in a foreclosure sale did not participate "sub-

stantially" in the formation of a contract for sale, where her conduct was limited to publishing legal notices of the sale and performing administrative tasks at the closing. *Id.* at 583. The court concluded that "[a] statute aimed at preserving the integrity of the decisionmaking process does not need to extend to employees who have no discretion to affect that process." *Id.* Selby also points to the language of the holding in *Irons*—"acts which comprise *execution* of the contract"—to argue that, because her involvement with ASCI occurred only after the original contract was signed, the statute does not apply here.

Neither *Ponnapula* nor *Irons* support Selby's claims because the record reveals that she did have a significant discretionary role in the ASCI contract, and that she was involved in the deal while there was still opportunity to change the financial outcome. Selby's involvement was not, as she characterizes it, merely ministerial or purely "post-contractual." Notwithstanding her lack of official decision-making authority over the ASCI project, the evidence at trial was sufficient for a jury to find that Selby could and did influence the decision process in favor of Knowmadic.

BPA and Knowmadic entered into the initial contract on May 11, 2001. It provided for the purchase of one copy of the Knowmadic software, associated maintenance, and related technical support. Selby was not involved in negotiations for this contract. In the spring of 2002, BPA was approaching an important deadline for the implementation of a major automated ordering function for its electricity customers. The software BPA had planned to use, ETMS, would apparently not be ready on time. Knowmadic's ASCI software was an alternative to ETMS, and Knowmadic met with BPA staff to discuss the possibility of expanding ASCI use.

The evidence shows that Selby actively sought to counter internal opposition to the expanded use of ASCI. Lorie Hoffman, the Tier 3 manager in Transmission and Marketing Divi-

sion, whose department the ASCI program was designed to support, was outspoken in her opposition to expanded use of ASCI. She was opposed to the ASCI program because BPA "had a number of resources being used, a number of people being used to develop the ETMS system" and because a lot of money had been expended and it was "going to be moving into our new scheduling system." She and others in the scheduling group expressed concern that "we had multiple kind[s] of tasks and multiple applications . . . being developed at the same time, and it seemed to be diverting us from what we thought we were trying to accomplish with the ETMS system." Selby attempted to counter this argument in internal communications with BPA staff. When the project manager, Exe, drafted an announcement about the proposed change, Selby added language indicating BPA had been doing business with Knowmadic since 2001 in direct response to the objections to diverting resources away from the existing plan.

On March 29, 2002, BPA and Knowmadic entered into a second "contract" for the provision of ASCI software and hardware, amending the May 11, 2001, agreement. The March 29, 2002, agreement provided for additional services to be procured on a time-and-materials basis, not to exceed $2,401,250.00, and a performance period of March 29, 2002, to July 1, 2002. Significantly, unless BPA chose to sign specific work orders for materials and new services, Knowmadic would not derive any benefit from the March 29, 2002, agreement.

BPA proceeded to implement Knowmadic's ASCI software on a broader basis than originally contemplated. BPA managers discussed even further expansion of ASCI capabilities, and Reynolds testified he consulted with Selby "at least weekly" about how BPA's resources should be allocated among various projects, including ASCI and ETMS. Reynolds believed Selby favored expanding ASCI rather than ETMS. When Exe gave an internal presentation describing ASCI and explaining why BPA was supporting ASCI over ETMS, Selby

arranged for other staff members to ask questions to convey the impression that ASCI enjoyed support among the staff. Reynolds testified that Selby was "instrumental" in arranging for cash awards for BPA staff members who were involved in the ASCI project. Selby acknowledges in her opening brief that "[t]he evidence showed that [she] advocated for ASCI/ CWI at a time when there was internal resistance, and that she discussed with [the project manager] ways to address those concerns."

By August 2002 it was apparent that ETMS would not be functional anytime soon, and BPA began considering expanding ASCI as a permanent replacement for ETMS. As we discuss below, Selby improperly forwarded an internal e-mail about the agency's deliberations to her husband Scott at Knowmadic. Selby was aware that the other Tier 3 managers "still had outstanding issues on whether to actually implement [ASCI]." She suggested to Charles Meyer, the BPA Vice President in charge of Transmission Marketing and Sales, that he "intervene and bring it to a closure." She then scheduled a meeting with the various players on August 26, 2002, for the purpose of deciding whether to proceed with hourly scheduling. At the meeting Selby advocated going forward. The managers finally agreed to recommended that BPA proceed to expand ASCI, and set September 10 as the deadline for implementing the new functions.

Later the same week, Reynolds discussed additional purchases by BPA in connection with adding new functions to ASCI with Scott Selby and Knowmadic sales representatives. On August 30, 2002, Reynolds signed two work authorizations for the purchase of additional software licenses, servers, and consulting services for the ASCI program. These purchase orders added up to $2,750,000, from which Scott Selby would receive commissions.

In October 2002, Selby was promoted to internal operations manager, which gave her supervisory authority over Reyn-

olds, the information technology manager. That month, BPA's procurement officer investigated invoices from Knowmadic and noted the authorizing documents had not gone through the regular procurement process. He met with Knowmadic representatives, including Scott Selby, and learned Scott was Jane Selby's husband. He informed Knowmadic that the situation was inappropriate and "could not continue." He also testified that Reynolds told Knowmadic representatives that Selby "was still trying to find a way to keep the deal together for the 2 million 750." Following an internal investigation of the Knowmadic relationship and disputed invoices, BPA and Knowmadic settled on a payment of approximately $1,300,000, for which Scott Selby received a commission of $10,493.52.

**[4]** This evidence provided ample basis from which the jury could reasonably find that what Jane Selby refers to as her "post-contractual" activities actually constituted significant participation in an ongoing procurement process. While her activities may have post-dated the May 11, 2001, basic contract, Selby exercised substantial influence over the decision-making process at the time when BPA was most aggressively expanding its contractual relationship with Knowmadic by expanding the scope of the vendor's work. Based on this evidence, any rational trier of fact could have found beyond a reasonable doubt that Selby participated substantially in the ASCI matter.

## B. Knowledge

**[5]** Selby next argues the evidence was insufficient for the jury to find that she acted knowingly. The text of § 208 prohibits participation by a government employee in matters which, "to his knowledge," he or his spouse has a financial interest. The district court instructed the jury that the government must prove that Selby "knew about the financial interest and knew her participation would have a direct and predictable effect . . . [i]n other words, that there was a close causal

link between her alleged participation in the matter and the expected effect of the matter on [the] financial interest." The question is whether the jury had sufficient evidence to overcome Selby's testimony regarding her own state of mind.

Selby testified at trial and now argues on appeal that she did not know her actions would affect her husband's compensation. We have held that "[a] trier of fact is not compelled to accept and believe the self serving stories of vitally interested defendants." *United States v. Cisneros*, 448 F.2d 298, 305 (9th Cir. 1971). Moreover, "[d]isbelief of a defendant's own testimony may provide at least a partial basis for a jury's conclusion that the opposite of the testimony is the truth." *United States v. Martinez*, 514 F.2d 334, 341 (9th Cir. 1975); *see also United States v. Price*, 623 F.2d 587, 591 (9th Cir. 1980). Instead, we look to whether the evidence of her action provided a sufficient basis for the jury to conclude that Selby acted with knowledge of the likely financial outcome.

Selby contends the evidence was insufficient to show that she knew her participation would have a direct and predictable effect because it was unclear what effect the decision to proceed with expanding ASCI capabilities would have on the Knowmadic contract. In particular, she contends that the function added in August and September 2002 "was built into the ASCI tool from the beginning" and "was not an enhancement."

However, the jury heard testimony from several witnesses that the decision to proceed with the hourly function would involve substantial additional work by Knowmadic. An employee of a Knowmadic subcontractor who worked on the ASCI project testified that adding the hourly function "would mean revamping the entire application." This dovetailed with the testimony of Mark Reynolds, who agreed that this addition of the hourly scheduling function "involve[d] additional software development work by technology specialists."

Additionally, on August 22, Selby forwarded to her husband an internal draft e-mail, which had also been sent to her for her input. After summarizing "a few points to make sure that [he] had captured what we had discussed," the draft e-mail concluded with a statement by Reynolds that he "[would] be giving the 'green light' to include hourly products as part of the production roll out of ASCI/CWI. Reynolds testified that the e-mail, which provided the basis for the wire fraud count, contained "inside information." Significantly, Selby acknowledged that "[i]n retrospect [she] should have asked Mark [Reynolds]" before she sent it to her husband. Given their intimate relationship, forwarding an internal office e-mail could rationally be explained by her knowledge of Scott's financial interest in the matter.

Moreover, the jury heard evidence that Selby had completed two conflict of interest memoranda during the period at issue. When Reynolds learned Scott Selby had been hired at Knowmadic, he told Selby it was necessary to follow the agency's conflict of interest disclosure procedures. BPA's ethics officer confirmed it was necessary for Selby to recuse herself from Knowmadic matters. On June 11, 2002, Selby circulated her first recusal memorandum within BPA. In relevant part, the memorandum reads as follows:

> I am seeking to disqualify myself from decisions related to the use of the Knowmadic software product because of a Conflict of Financial interest. I have a personal financial interest in Knowmadic because my spouse is an employee of the company.

The jury also received evidence that Selby's second recusal memorandum contained false information. Selby filed the second memorandum on January 13, 2003, just after BPA completed its internal investigation of the disputed Knowmadic invoices. The memorandum incorrectly states that Scott Selby became a Knowmadic employee in June 2002, rather than April 2002. Selby testified that she put down the wrong date

by mistake. However, the jury was entitled to draw an adverse inference that she acted with wrongful intent by deliberately misstating the dates of her husband's employment with Knowmadic.

**[6]** Ultimately, the jury was entitled to conclude Selby knew that promoting additional ASCI functionality would lead directly to a broader contractual relationship with Knowmadic, and in turn, financial gain for her husband, who earned commissions on sales to BPA. In light of Selby's recusal memoranda, the jury could also conclude Selby specifically knew of her husband's financial interest during the period covered by her "mistake" in dates, the very sort of ethical dilemma proscribed by § 208.

*C. Willfulness*

Selby also argues the evidence was insufficient to prove she "did not act in willful violation of the law." The willfulness requirement arises under 18 U.S.C. § 216(a)(2), the penalty provision relating to § 208. The district court instructed the jury that the government was required to prove that Selby acted "with the purpose of violating a known legal duty." Selby contends there is insufficient evidence that she acted willfully because the BPA ethics advisor told her that "she could participate in implementation, as long as she stayed away from contract negotiations and other financial matters."

**[7]** Upon meeting with BPA's ethics advisor, Selby prepared and signed her first recusal memorandum. This memorandum, circulated on June 11, 2002, declared Selby's disqualification from "decisions related to the use of the Knowmadic software product." Both Selby and the ethics officer signed the document. The record therefore supports the conclusion that during the spring of 2002, Selby knew and acknowledged that BPA's ethics rules required her complete disqualification from the decisionmaking process.

**[8]** As discussed above, Selby did not in fact stay away from contract and financial matters. She actively participated in deliberations at a time when BPA was expanding its business relationship with Knowmadic. Though Selby testified that she was merely participating in "implementation," in accordance with the ethics officer's advice, the jury was not required to credit her testimony. The evidence was sufficient for a rational juror to conclude that Selby had willfully violated § 208.

IV

Selby also challenges her conviction for making false statements under 18 U.S.C. § 1001, which prohibits giving false information in any matter within the jurisdiction of a department or agency of the United States. A conviction under § 1001 requires the government to prove beyond a reasonable doubt that the defendant: 1) made a statement, 2) that was false, and 3) material, 4) with specific intent, 5) in a matter within the agency's jurisdiction. *United States v. Camper*, 384 F.3d 1073, 1075 (9th Cir. 2004). Selby challenges the sufficiency of the evidence of materiality and intent.

*A. Materiality*

The false statement at issue appears in Selby's second recusal memorandum. As discussed above, Selby indicated in the memorandum that Scott began working for Knowmadic on June 1, 2002, when in fact he started on April 1, 2002.

Selby contends the updated memorandum was written to clarify the scope of her recusal following Scott's resignation from Knowmadic, and the statement had no connection to BPA's decisions about Selby's recusal. However, as the district court noted, the relevant agency decisions for purposes of the statement's materiality are BPA's decisions about the disputed Knowmadic invoices, worth over $2,750,000. The false statement as to Scott's employment dates—and therefore

his entitlement to commissions from sales she influenced within the agency—was relevant for the BPA's analysis regarding the scope and length of the conflict of interest.

**[9]** A rational juror could have found that Selby's false statement regarding her husband's start date was material to the agency's decisionmaking.

*B.   Intent*

Selby also contends the evidence was insufficient to prove she intended to make the false statement to the BPA. She maintains the misstatement was merely an inadvertent mistake.

The jury was entitled to conclude otherwise. As we have noted in other criminal fraud contexts, "[i]t is settled law that intent to defraud may be established by circumstantial evidence." *United States v. Milwitt*, 475 F.3d 1150, 1162 (9th Cir. 2007) (quoting *United States v. Rogers*, 321 F.3d 1226, 1230 (9th Cir. 2003)); *see also United States v. Bucher*, 375 F.3d 929, 934 (9th Cir. 2004) ( "Culpable intent can be inferred from the defendant's conduct and from the surrounding circumstances").

**[10]** Selby made the false statement under circumstances that support a reasonable inference that she knew it was false. Viewing the evidence in the light most favorable to the prosecution, any rational juror could have found that Selby acted with the required intent.

V

Finally, Selby contends the evidence at trial was insufficient to support her conviction of wire fraud under 18 U.S.C. § 1343. The charge at trial alleged Selby sent the August 22 e-mail to her husband in furtherance of a scheme to deprive BPA of its right to honest services. A conviction under § 1343

requires the government to prove: 1) a scheme to defraud, 2) use of the wires in furtherance of the scheme, and 3) specific intent to defraud. 18 U.S.C. § 1343; *United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008). Selby challenges the sufficiency of the evidence on all three elements.

### A. Scheme to Defraud

First, she claims that because the evidence was insufficient to support the conflict of interest conviction, it was necessarily insufficient to support the conviction for wire fraud under 18 U.S.C. § 1343. In particular, she claims that she "did not fail to disclose her husband's financial interest in Knowmadic; nor did she secretly influence decision-making with regard to the ASCI project."

[11] However, as discussed above, we find the evidence was sufficient for a rational juror to conclude that Selby had a conflict of interest in violation of § 208, and that she had not been entirely candid in disclosing that conflict to her employer. The jury was not required to credit her testimony that she had made the sort of complete and honest disclosure that would defeat a wire fraud charge. Therefore, the evidence was sufficient for a rational juror to conclude she had engaged in a scheme to defraud BPA. 18 U.S.C. § 1346 (amending fraud statutes to include schemes to deprive another of the "intangible right of honest services"); s*ee United States v. Bohonus*, 628 F.2d 1167, 1171 (9th Cir. 1980) ("The requisite 'scheme or artifice to defraud' is found in the deprivation of the public's right to honest and faithful government.").

### B. Use of the Wires

[12] Second, Selby claims her use of the wires was not in furtherance of the scheme. However, the use of the wires need not be an essential element of the scheme in order to further the scheme. *See United States v. Shipsey*, 363 F.3d 962, 971 (9th Cir. 2004); *United States v. Lo*, 231 F.3d 471, 478 (9th

Cir. 2000). The internal e-mail Selby forwarded to her husband, which documented BPA's debate on whether to expand ASCI, is sufficient to establish the element of the use of the wires in furtherance of the scheme.

## C.   *Intent*

Finally, Selby claims the government failed to prove that she intended to deceive the BPA. She argues that although she should not have forwarded the e-mail, it does not show intent "to deceive her employer or to secretly pass on information to Knowmadic."

**[13]** As we discussed above, the jury was entitled to reject Selby's testimony regarding her intent. Extensive evidence showed that Selby was actively involved in promoting additional business between BPA and Knowmadic, in which her husband had a financial interest, in violation of the fraud statute. She forwarded to her husband an e-mail discussing BPA's internal deliberations just before BPA informed Knowmadic that it planned to expand the use of ASCI. Given these circumstances, a rational juror could have found that Selby forwarded the internal email to her husband with "culpable intent." *See Bucher*, 375 F.3d at 934.

## VI

Viewing this evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of all three crimes beyond a reasonable doubt. Because the evidence established that the defendant knowingly violated § 208 and the related provisions of Title 18 with which she was charged, her judgment of conviction is **AFFIRMED.**