UNITED STATES of America,
Plaintiff–Appellee,

v.

Robert Lewis HEDGES,
Defendant–Appellant.

No. 89–7705.

United States Court of Appeals,
Eleventh Circuit.

Sept. 26, 1990.

George L. Beck, Jr., Montgomery, Ala., Robert S. Rennett, Paul Pilchen, Mitchell S. Ettinger, Skadden, Arps, Slate, Meagher & Flom, Washington, D.C., for defendant-appellant.

James Eldon Wilson, U.S. Atty., Charles R. Niven, Asst. U.S. Atty., Montgomery, Ala., Col. Al Rotach, HQ USAF JACN, Washington, D.C., for plaintiff-appellee.

Before KRAVITCH and COX, Circuit Judges, and DYER, Senior Circuit Judge.

DYER, Senior Circuit Judge:

Hedges appeals his conviction of taking government action while having a conflicting financial interest in violation of Title 18, United States Code, Section 208(a). We agree with the district court that the statute is properly construed as a strict liability offense and is not unconstitutionally vague as applied to Hedges. We reverse, however, because it was error to refuse to instruct the jury on Hedges' entrapment by estoppel defense.

## Statement of the Case

Hedges served in the United States Air Force for over 23 years and attained the rank of Colonel. He was a regulated federal employee under Section 208. He assumed command of the Automated System Project Office (ASPO) in July 1981. In late 1983, he decided to retire from Government service and to seek civilian employment. In January 1984, he notified his superior officer of this decision and sought permission to work in the private sector during his 60-day terminal leave period. His request was granted. His terminal leave was to commence on June 2, 1984, and his full retirement was to be effective on August 1, 1984.

In Hedges' position as Commander and Program Manager of ASPO, he was responsible for the conduct and implementation of two programs, i.e., Phase IV and the Inter–Service/Agency Automated Message Processing Exchange (I–S/AAMPE). Phase IV was a large contract which was to take the existing computer systems used by all Air Force bases world-wide, analyze them and develop new systems which would operate new hardware and software with enhanced expansion and workload capabilities. The estimated life-cycle cost was $1 billion. I–S/AAMPE, another large contract, which had yet to be released for bids, was designed to provide a computerized data and communications network between all Services. The estimated life-cycle cost was between $4 and $5 billion.

Sperry Corporation was one of many potential bidders for the award of the I–S/AAMPE contract and was the prime contractor for Phase IV.

Hedges was also the chairman of the Source Selection Evaluation Board for the I–S/AAMPE Program. The Board was responsible for preparing the formal contracting Requests For Proposals (RFP) released to industry and evaluating proposals submitted by contractors.

Captain Lehman was Staff Judge Advocate for the ASPO and was responsible for program and contract matters. He was also Standards of Conduct Counselor charged with advising personnel about conflict of interest matters and issues involving violations of regulations. Lehman worked closely with Hedges on Phase IV

and I–S/AAMPE and was fully familiar with Hedges' efforts and responsibilities.

Hedges took several actions in late May and on June 1, 1984 (prior to his terminal leave which began on June 2, 1984) concerning Phase IV and I–S/AAMPE. On May 17, 21, 23, 25, 31 and June 1, 1984 he signed several contract change proposals for Phase IV. On May 14 and 25, 1984, he approved an I–S/AAMPE Report and Decision Memorandum, and on May 24, 1984, he attended a briefing related to the I–S/AAMPE RFP. These actions did not result in the payment of any money to Sperry or pertain to the award of any contract and were in the best interests of the Air Force since they resulted in substantial savings to the Air Force.

Hedges' corporate counterpart at Sperry on the Phase IV program was Traylor, Vice President of Sperry's Federal Projects Operations, located in McLean, Virginia. They spoke with each other regularly on the telephone and at meetings. Hedges first raised the subject of his impending retirement in April 1984 in a telephone conversation with Traylor during which Hedges asked for general advice about entering private industry. Traylor understood that Hedges was considering either teaching or seeking private employment in the aerospace industry. In addition to giving Hedges general advice, Traylor also told him that if Hedges wanted to go into the data processing industry, he would appreciate it if he would tell Traylor about it and give the Sperry Corporation an opportunity to hire him. Hedges indicated that he had no interest in working for Sperry.

Despite Hedges' disinterest in working for Sperry, Traylor had his personnel manager prepare a draft consulting agreement so that he would be ready if, later on, Hedges changed his mind and decided to go into data processing or communications with a private corporation. Hedges did not know about this.

In mid-May 1984, Hedges decided to consider defense consulting work, in addition to teaching. About this time, Hedges had another telephone conversation with Traylor and told him that he had opened his options to include consulting and that he might discuss the possibility of employment with Teledyne or Compusec. Traylor indicated that he would be interested in Hedges consulting for Sperry, but Hedges did not respond to this suggestion.

On May 29, 1984, Traylor spoke again with Hedges and raised the possibility of Hedges' employment with Sperry. He told Hedges that he was preparing to send a boiler-plate consulting agreement to him. In terms of salary, Traylor said he was looking at a range of about $65,000. Hedges responded that he expected $75,000. Traylor told Hedges that he had no authority to offer Hedges a job, a salary, or consulting agreement, but that he thought he could get the salary requirement from his superiors at Sperry. During this conversation, Traylor and Hedges also discussed the fact that Hedges would be working for the Sperry I–S/AAMPE Program Manager.

Hedges told Traylor that he had been receiving guidance from his Standards of Conduct Counselor, Lehman, and that he could not and would not consider accepting employment with Sperry until Lehman reviewed the draft for compliance with all conflict of interest laws and regulations and gave him the green light to proceed. Traylor told Hedges that any future offer of employment would also have to be cleared for potential conflicts by Sperry's legal department. Traylor subsequently spoke with his corporate superiors and they approved a salary of $75,000.

Hedges received the letter consulting agreement draft at his home on May 31, 1984. It contained no salary or terms of employment. On June 1, 1984, Hedges' last day prior to terminal leave, he asked Lehman to review the draft. Lehman raised several substantive objections and either edited or redrafted portions of the draft in order to satisfy the conflict of interest concerns. Lehman did not tell Hedges that the consulting agreement should not be discussed with Sperry, nor did he tell Hedges to wait until his terminal leave began in 24 hours, at which time employment negotiations could proceed

without risk of violating any statutes or regulations.

After the draft was marked up by Lehman, Hedges telephoned Sperry's attorney Reisman, and told him that the consulting agreement would have to be changed as he could not perform some of the work requirements contained in the draft agreement.

On June 4, 1984, while Hedges was on terminal leave, Traylor informed him that the consulting agreement would be modified as requested and that Reisman had approved it. On June 8, 1984, Hedges signed the agreement and he started to work for Sperry after June 11, 1984.

After June 1, 1984, while on terminal leave, Hedges was free to negotiate with Sperry. There was no impropriety of Hedges working for Sperry while on leave and thereafter.

The jury returned a verdict of guilty. The court imposed a fine of five thousand dollars but suspended execution on the judgment pending this appeal.

### Construction of Section 208(a)

18 U.S.C. § 208(a) provides in pertinent part:

> Whoever, [being covered by this section] participates personally and substantially ... in ... [a] particular matter in which, to his knowledge ... any ... organization with whom he is negotiating or has any arrangement concerning prospective employment, has a financial interest ... [shall be guilty of a felony].

On the eve of trial, the government filed a Motion In Limine which sought to exclude any evidence that Hedges received and relied upon legal advice from Lehman. The government argued, and the district court ruled, that Section 208(a) is a strict liability offense that does not include an element of *scienter*. Under this construction, Hedges' awareness was not in issue, and any guidance that Hedges received from his Standards of Conduct Counselor was held irrelevant. This also precluded consideration of Hedges' claim that he fully complied with Air Force Regulations, that

he followed the advice of Lehman, and generally exercised extreme care to avoid breaking the law.

Prior to trial, the court modified its order to permit limited testimony concerning conversations that Hedges had with Lehman, but only insofar as those conversations bore on a jury question of whether in fact Hedges' conversations with Traylor amounted to negotiations.

■ The first issue that we are called upon to determine is whether Section 208(a) is a strict liability offense or whether general intent or *scienter* is necessary to be shown before there can be a violation of the statute. The indictment did not allege, nor did the government prove, Hedges' intent to violate Section 208(a).

A fair reading of the record shows that with respect to the government's case, Hedges was an officer of the executive branch of the United States Government; that he participated personally and substantially as a government officer in a particular matter in which, to his knowledge, Sperry had a financial interest.

This left an issue only as to whether Hedges, while still on active duty, was negotiating for prospective employment. Under the strict liability offense construction of the statute, the government adduced sufficient evidence without proof of *scienter* to withstand Hedges' motion for a directed verdict at the close of the government's case. For the reasons which follow, we hold that Section 208(a) is a strict liability offense statute.

### Analysis

Hedges argues that by its terms Section 208(a) is a general intent statute. He suggests that this statute is not easy to parse, but that we should find *scienter* applicable to each statutory element. He reasons that although the statute's "knowledge" clause is segregated from the remaining elements of the offense by commas, this setoff of the knowledge clause does not limit its reach, as the district court held, so as to apply only to the financial interest. On the contrary, he submits that since Section 208(a) contains a *scienter* clause, it

indicates that knowledge is an element of the offense.

Hedges relies on *Liparota v. United States*, 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985) and *United States v. Nofziger*, 878 F.2d 442 (D.C.Cir.), *cert. denied*, ___ U.S. ___, 110 S.Ct. 564, 107 L.Ed.2d 559 (1989), as being analogous to this case and as requiring proof of knowledge as to each element of the offense. We do not view these cases as supportive of Hedges' argument. In these cases, the court was called upon to analyze Congressional intent where the mental state requirement was placed before all the elements in question. Here, however, the syntax of Section 208(a) is clear. Moreover, in *Liparota*, it was necessary for the Supreme Court to construe the intent of Congress as to the mental state required for an offense under one subsection of the Code in light of the more clearly articulated mental state requirement in the immediately succeeding and related subsection of the Code set out in the statute. Section 208(a) has no companion criminal subsection, let alone one that might appear inconsistent. Also, concern was expressed that the lack of mental state at issue would result in "criminaliz[ing] a broad range of apparently innocent conduct". 471 U.S. at 426, 105 S.Ct. at 2088. In contrast, Section 208(a) is "the most crystallized expression of the concept of conflict of interest". *United States v. Irons*, 640 F.2d 872, 876 (7th Cir.1981). It has a narrow application regulating only certain official conduct of federal employees in their official capacity.

In *Nofziger*, the court pointed to the fact that the lack of the mental state at issue would result in "criminaliz[ing] the actions of any former government official who lobbies his agency on a matter in which, unknown to him, the agency has acquired a direct and substantial interest". 878 F.2d at 453. It refused to find that the statute was a public welfare statute because of its potential for chilling speech. These two significant concerns have no parallel application to Section 208(a). Here, however, the statute specifically places the mental state requirement of knowledge in the last element and thus requires that the government official have knowledge of the conflicting financial interest. As to the other elements, the individual should know that: (1) he is an officer and/or employee, (2) he is participating personally and substantially, and (3) he is negotiating or having an arrangement for employment.

Next, Hedges draws our attention to the waiver provision set forth in Section 208(b) [1] as an indication that Section 208(a) is not a strict liability offense. This section sets up a process whereby an employee of the government can obtain a written opinion which could waive the provisions of Section 208(a) if full disclosure is made. Hedges did not attempt to procure such a statutory waiver. We are unable to follow Hedges' argument that Section 208(b) is helpful to him. On the contrary, it is no more than a safety valve which under the prescribed conditions eliminates criminal conduct that could ensue as a result of the stringent provisions of Section 208(a).

## The Legislative History

In the seminal case of the *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 548, 81 S.Ct. 294, 308–10, 5 L.Ed.2d 268, 288–89 (1961), in considering Section 208's predecessor statute, 18 U.S.C. § 434, the Supreme Court reviewed the legislative history of the conflict of interest statute. It observed that "[t]he obvious purpose of the statute is to insure honesty in the Government's business dealings by preventing federal agents who have interests adverse to those of the Government from advancing their own interests at the expense of the public welfare." Although

---

1. 18 U.S.C. § 208(b) provides in pertinent part:
    (b) Subsection (a) hereof shall not apply (1) if the officer or employee first advises the Government official responsible for appointment to his or her position of the nature and circumstances of the ... application ... and makes full disclosure of the financial interest and receives in advance a written determination made by such official that the interest is not so substantial as to be deemed likely to affect the integrity of the services which the Government may expect from such officer or employee....

the statute, enacted in 1863, has been reenacted several times, "the broad prohibition contained in the original statute has been retained throughout the years."

Actual corruption or actual loss suffered by the government are not elements of the crime. "This omission indicates that the statute establishes an objective standard of conduct, and that whenever a government agent fails to act in accordance with that standard, he is guilty of violating the statute, regardless of whether there is positive corruption." Thus the statute establishes "a rigid rule of conduct." 364 U.S. at 549–51, 81 S.Ct. at 309–10.

Later, Section 208 was enacted to replace § 434 for the reasons set for in *United States v. Irons*, 640 F.2d 872, 878 (7th Cir.1981). There the court said:

Notwithstanding the Supreme Court's expansive reading of Section 434, Congress replaced it with Section 208 in 1962. The intended broad scope of Section 208 is emphasized in passages from both the House and Senate Reports. The House Report explained:

Section 208 supplants 18 U.S.C. § 434 which disqualifies government officials who are pecuniarily interested in business entities from transacting business with such entity on behalf of the Government. *Section 208(a) would prohibit not merely 'transacting business' with a business entity in which the government employee is interested but would bar any significant participation in government action in the consequences of which to his knowledge the employee has a financial interest.*

H.R.Rep. No. 748, 87th Cong., 1st Sess. 24 (1961). Similarly, the Senate Report noted:

... [S]ubsection (a) improves upon the present law [§ 434] by *abandoning the limiting concept of the 'transaction of business.' The disqualification of the subsection embraces any participation* on behalf of the Government in a matter in which the employee has an outside financial interest, even though his participation does not involve the transaction of business.

S.Rep. No. 2213, 87th Cong., 1st Sess., (1961), *reprinted in* [1962] U.S.Code Cong. & Ad.News 3852, 3862.

The intent element of Section 208 is clearly set forth in *United States v. Gorman*, 807 F.2d 1299, 1304 (6th Cir.1986), *cert. denied*, 484 U.S. 815, 108 S.Ct. 68, 98 L.Ed.2d 32 (1987), where the court held:

Section 208 sets forth an objective standard of conduct which is directed not only at dishonor, but also at conduct which tempts dishonor. *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1960). The specific standard applicable in the present case is that the defendant must have known that the person with whom he was negotiating concerning employment had a financial interest in the defendant's official work. *See K & R Engineering Co. v. United States*, 616 F.2d 469, 472 (Ct.Cl.1980).

We conclude that Congress has made it clear that Section 208(a) does not require a mental state for the first three elements while placing a mental state requirement on the last element.

### The Principle of Lenity

Hedges argues that if there is ambiguity, the rule of lenity prescribes adoption of the construction most favorable to the accused. We do not disagree with this statement of the rule. We, however, find the rule inapplicable in this case because we see no ambiguity in the statute. *United States v. Green*, 904 F.2d 654 (11th Cir.1990). As this court held in *United States v. Curry*, 902 F.2d 912, 915 (11th Cir.1990):

The rule of lenity ... is applicable only where there exists some ambiguity in both the statutory language and legislative history concerning the breadth of activity prohibited by a criminal statute. *See United States v. Rodgers*, 466 U.S. 475, 104 S.Ct. 1942, 1948, 80 L.Ed.2d 492 (1984) (statute not sufficiently ambiguous to permit rule of lenity to control); *Bifulco v. United States*, 447 U.S. 381,

100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980) ("Where Congress has manifested its intention, we may not manufacture ambiguity in order to defeat that intent"). When the statute's provisions clearly delineate the manner in which congressional objectives are to be realized, then the need to interpret a statute in the narrowest possible manner dissipates. *McElroy v. United States*, 455 U.S. 642, 102 S.Ct. 1332, 1341, 71 L.Ed.2d 522 (1982) ("although 'criminal statutes are to be construed strictly ... this does not mean that every criminal statute must be given the narrowest possible meaning in complete disregard of the purpose of the legislature.'") (quoting *United States v. Bramblett*, 348 U.S. 503, 509–10, 75 S.Ct. 504, 508, 99 L.Ed. 594 (1955) (footnotes omitted)).

### Vagueness of the Statute As Applied

■ Hedges contends that if Section 208 is construed to impose strict liability, then it is unconstitutionally vague as applied to his conduct. He argues that the strict liability offense ruling resulted in an overbroad construction of "negotiations". We reject Hedges' "I didn't know I was negotiating argument". It was made clear that on May 29, 1984, Hedges and Traylor of Sperry were talking about entering into a consulting agreement and that Hedges indicated that he was looking for $75,000 a year. That all of the terms of the agreement were not settled at that time, does not foreclose the fact that negotiations for employment were discussed. At the close of the government's case, there was a colloquy between Hedges' counsel and the court concerning Hedges' motion for judgment of acquittal:

The Court: They were talking about money, as I—my notes reflect. Wouldn't that be a jury question whether they were negotiating? I mean, here you've got a man who says first we can't offer you but 65 and he comes back and says

well I'm looking in the $75,000 range. Doesn't that make that a jury question? Mr. Bennett: I think it does, your honor....

"Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed." *United States v. National Dairy Products Corp.*, 372 U.S. 29, 32–33, 83 S.Ct. 594, 598, 9 L.Ed.2d 561, 565 (1963). In *United States v. Conlon*, 628 F.2d 150, 154 (D.C.Cir.1980), *cert. denied*, 454 U.S. 1149, 102 S.Ct. 1015, 71 L.Ed.2d 304 (1982), the court held that "... the terms 'negotiating' and 'arrangement' are not exotic or abstruse words requiring detailed etymological study or judicial analysis. They are common words of universal usage. People of ordinary intelligence would have fair notice of the conduct proscribed by the statute". The word "'[n]egotiation' is to be given its common everyday meaning...." *United States v. Gorman*, 807 F.2d 1299, 1303 (6th Cir.1986), *cert. denied*, 484 U.S. 815, 108 S.Ct. 68, 98 L.Ed.2d 32 (1987). The term is to be broadly construed. *United States v. Lund*, 853 F.2d 242, 246 (4th Cir.1988). *See also United States v. Petrillo*, 332 U.S. 1, 7–8, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877, 1883 (1947); *United States v. Irons*, 640 F.2d 872, 878–79 (7th Cir.1981); *United States v. Nasser*, 476 F.2d 1111, 1115 (7th Cir.1973).

Finally, we observe that the court gave Hedges' requested instruction on negotiation.[2]

We conclude that the statute was not vague as applied to Hedges' conduct.

### Hedges' Defense

■ Hedges mounted a two-prong defense. First, he denied that his conversations with Traylor of Sperry and his actions preceding his terminal leave were "negotiations" within the meaning of Section 208(a). He insists that they were no more than

---

**2.** The court instructed:

Negotiation is a communication between two parties with a view to reaching an agreement. Negotiation connotes discussion and active interest on both sides. Preliminary or explor-

atory talks do not constitute negotiation. Rather, to find a negotiation, you must find that there was a process of submission and consideration of offers.

preliminary and exploratory actions. We dispose of that contention by our finding that this was a jury issue.

■ The second prong to Hedges' defense is his reliance upon the legal advice of a public official charged with interpreting the law, or entrapment by estoppel. Notwithstanding the fact that the court granted the government's Motion In Limine that any guidance that Hedges received from Lehman, his Standards of Conduct Counselor, was not a defense and evidence on that was not relevant, the court without any objection by the government allowed all testimonial evidence on this issue, the only exception being that neither Hedges or Lehman was permitted to give an opinion on the ultimate issue of whether Hedges' conduct was legal.

Lehman was Hedges' Standards of Conduct Counselor assigned as such by General McCarthy, and was charged with the duty and responsibility of precluding any conflict of interest that might arise.

According to Hedges, he told Lehman in January or February 1984 that he wanted Lehman to advise him on his actions until the time he retired. He often consulted with Lehman because he was sensitive to the possibility of a conflict of interest in dealing with contractors. He talked with Lehman about his discussions with Traylor in mid-May. He was told there was no problem about his Washington briefing on May 23. When, on May 29, Traylor told him about sending a boiler-plate draft of a consulting agreement, Hedges said he would give it to Lehman for review of any conflict of interest problems. The draft was mailed May 30, and Hedges gave it to Lehman on June 1 for review. Lehman edited it and made changes and was in the room during Hedges' telephone conversation with Reisman, the attorney for Sperry, concerning the changes made to avoid a conflict of interest. At that time, Lehman did not tell Hedges that his actions might amount to a conflict of interest and that he should wait until June 2 when his terminal leave would begin, and then there could not be any problem about a conflict of interest. Hedges maintained that he sought and was given advice from Lehman about both pre- and post-retirement possible conflicts of interest, and that he relied on Lehman for such advice.

In rebuttal, Lehman was called by the government. He testified that Hedges consulted him only with reference to what he could or could not do with respect to post-retirement activities—that pre-retirement activities were not discussed. Lehman denied that Hedges ever had a discussion with him about his exploratory talks with contractors, nor did he seek his advice about the Washington meeting. Lehman said he spent only about five or ten minutes reviewing and editing the Sperry draft agreement on June 1 because he thought it was simply a letter that might be reduced to a contract at some later date. He did not tell Hedges that he should not have anything to do with Sperry until June 2 when he was on terminal leave. He observed that Hedges had a sensitivity to conflict of interest issues, was a man of outstanding character and of the highest personal integrity.

A very substantial portion of the record consists of Hedges' evidence of reliance on Lehman's advice concerning both pre- and post-retirement and the rebuttal evidence contradicting Hedges on various points. Without objection, all of this evidence was submitted to the jury. Nevertheless, the court declined to grant Hedges' request that the court instruct the jury that reasonable reliance upon the legal advice of a public official charged with interpreting the law is a defense, but instead the court charged the jury that "[a]ny advice given by Major Lehman to the defendant on the subject of whether certain activities were permissible on the part of the defendant before he left the Air Force, if you believe such advice was in fact given, is not a defense to the charge in this case."

The government seeks to support the court's ruling and charge by arguing that: (1) Lehman was not a public official; (2) he was a subordinate military officer who worked directly for Hedges who was his rating officer; (3) reliance on counsel is unavailing except in cases involving specif-

ic intent; and (4) Lehman did not have actual authority to waive the provisions of Section 208(a).

■ We note at the outset that entrapment by estoppel applies when an official tells a defendant that certain conduct is legal and the defendant believes that official. *Cox v. Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965); *Raley v. Ohio,* 360 U.S. 423, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959); *United States v. Tallmadge,* 829 F.2d 767 (9th Cir.1987); *United States v. Clegg,* 846 F.2d 1221 (9th Cir.1988); *see also United States v. Hsieh Hui Mei Chen,* 754 F.2d 817 (9th Cir.), *cert. denied,* 471 U.S. 1139, 105 S.Ct. 2684, 86 L.Ed.2d 701 (1985).

We take up the government's contentions seriatim. Its first contention that Lehman's status is not that of a public official is not supportable. In *Cox v. Louisiana, supra,* Cox was advised by the Chief of Police that a demonstration could be held, though not near the courthouse. It was held at an approved location, and Cox was later convicted of violating a Louisiana statute prohibiting picketing near a courthouse. The Supreme Court reversed, holding that the police chief was a public officer and that such an action "would be to sanction an indefensible sort of entrapment by the State". 379 U.S. at 571, 85 S.Ct. at 484 (citing *Raley, supra,* 360 U.S. at 426, 79 S.Ct. at 1260).

In *United States v. Tallmadge, supra,* a federally licensed gun dealer sold a firearm to Tallmadge after advising him that his status under the circumstances then prevailing took him outside the legal proscription against felons owning firearms. The court reversed his conviction, holding that "the United States Government has made licensed firearms dealers federal agents in connection with the gathering and dispensing of information on the purchase of firearms. Under these circumstances, we believe that a buyer has the right to rely on the representations of a licensed firearms dealer ...". 829 F.2d at 774. *See also United States v. Clegg, supra.*

■ In our view, a Standards of Conduct officer in the Air Force who by regulations and direct orders of his superior is given the charge of advising officer personnel of conflict of interest problems is as much a responsible public officer as a police chief and a licensed firearms dealer.

■ We need not pause long to consider the argument that since Lehman was a military subordinate of Hedges, he cannot be a public officer on whom Hedges could rely. Injection of rank in the military hierarchy as having something to do with the carrying out of his duties and professional advice as a Standards of Conduct officer is entirely irrelevant. There is also no foundation in this record that any unfavorable inference can be drawn because of military rank.

■ The government next submits that Section 208(a) has no requirement of specific intent as a requisite mental state, and accordingly, reliance on advice of counsel is not a defense. This argument misses the point. We have already pointed out that this is not a reliance on advice of counsel case. It is a reliance on a public officer's advice raising an entrapment by estoppel defense. This rests upon principles of fairness rather than the defendant's mental state and thus it may be raised even in strict liability offense cases. *United States v. Tallmadge, supra* at 773.

Finally, the government, assuming for the sake of argument that Lehman was a public officer, urges us to find that he did not have actual authority to waive or authorize the proscribed activity under Section 208(a). The premise is faulty. There has never been a suggestion that Lehman could waive or authorize a violation of the statute. On the contrary, the only issue before us, clearly, is whether Hedges acted on advice that he was not violating the statute.

Hedges properly and timely requested the court to instruct the jury on the defense theory. The court refused the request. "A defendant is entitled to have the court instruct the jury on the theory of the defense, as long as it has some basis in the evidence and has legal support". *United States v. Orr,* 825 F.2d 1537, 1542 (11th

**1406**

Cir.1987). *See also United States v. Tere-becki*, 692 F.2d 1345, 1351 (11th Cir.1982). The evidence must be reviewed in the light most favorable to the defendant in determining whether a basis for the instruction exists. *Richardson v. United States*, 403 F.2d 574, 575 (D.C.Cir.1968). "[T]he defendant 'is entitled to have presented instructions relating to a theory of defense for which there is *any foundation* in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility.'" *United States v. Lively*, 803 F.2d 1124, 1126 (11th Cir.1986) (quoting *United States v. Young*, 464 F.2d 160, 164 (5th Cir.1972)).

The failure to give the requested charge on the theory of the defense, and giving the charge that any advice given by Lehman to Hedges was not a defense to the offense charged was reversible error.

The judgment of conviction is RE-VERSED.[3]

---

**3.** Our disposition of the case makes it unnecessary for us to reach Hedges' assignment of error that the rebuttal argument of the government was prejudicial.