UNITED STATES of America,
Plaintiff–Appellee,

v.

Eugene Donald SCHALTENBRAND,
Defendant–Appellant.

No. 90–8228.

United States Court of Appeals,
Eleventh Circuit.

May 13, 1991.

Deryl D. Dantzler, Macon, Ga., for defendant-appellant.

Miriam Wansley Duke, Asst. U.S. Atty., Macon, Ga., for plaintiff-appellee.

## ON PETITION FOR REHEARING

Before TJOFLAT, Chief Judge, KRAVITCH, Circuit Judge, and GODBOLD, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

Appellant's petition for rehearing is granted. The opinion entered February 7, 1991 is vacated. The following opinion is entered in lieu thereof:[1]

## INTRODUCTION

Defendant–Appellant Colonel Eugene Schaltenbrand appeals his conviction of two violations of the government employee conflict of interest statutes. Specifically, he was convicted under 18 U.S.C. § 208(a), which prohibits government employees from working on projects in which they have a financial interest, and 18 U.S.C. § 207(a), which prohibits former government employees from representing private parties before the government on matters in which they previously worked for the government. We affirm the section 208(a) conviction and reverse the section 207(a) conviction.

## FACTS

In early 1987, the United States Air Force was engaged in a program to sell certain C–130 aircraft to friendly countries. These aircraft were being phased out of the American fleet because they were no longer cost effective to keep as a means of primary defense. One aspect of the program was to develop a system of mainte-nance and support for the aircraft through a private defense contractor.

Colonel Carl McPherson served as the System Program Manager of the project. To assist him on the project, McPherson requested the activation of Schaltenbrand, a reserve officer who was available at the time for extended service. From February 17, 1987 through May 1, 1987, Schaltenbrand was activated nine times for short periods of duty, usually lasting two to five days, with one period of sixteen days. Air Force records show that some of these periods were designated "active" duty, while some were designated "inactive" duty. During periods of inactive duty, Schaltenbrand was not paid, but was required to wear his uniform and received credit towards retirement.

In March 1987, Schaltenbrand was sent to Peru to do a site survey, the purpose being to determine the needs of that country so that the Air Force could better tailor a package of aircraft and support for it. While Schaltenbrand was in Peru, discussions between the Air Force and Mexico were progressing rapidly, and McPherson sent Schaltenbrand to Mexico to perform a site survey there also. Shortly after Schaltenbrand's return from Mexico, McPherson requested that Schaltenbrand be activated for a sixty-day period to work exclusively on the Air Force's deal with Mexico (the "Mexican Project"). McPherson made this request on March 25, 1987, but the sixty-day period did not actually begin until May 3, 1987. According to McPherson, Schaltenbrand was to be his "right-hand man" on the Mexican Project.

In early April 1987, Schaltenbrand attended a meeting concerning the Mexican Project. The purpose of the meeting was to discuss the Mexican site survey and to hear a proposal from Teledyne Brown Engineering ("TBE"), a private contractor that had been selected by the Mexican government as the likely provider of support for the aircraft being sold to Mexico.

---

**1.** On petition for rehearing, appellant Schaltenbrand argues, inter alia, that our opinion entered February 7, 1991 overlooked critical language in the indictment concerning his conviction under 18 U.S.C. § 207(a). We agree. The other arguments presented in appellant's petition are meritless.

At that time, TBE's contract for the project had not been finalized. Following the meeting, Schaltenbrand spoke with Harold Timmons, TBE's vice president and representative at the meeting. Schaltenbrand informed Timmons that he was interested in working for TBE after his duty with the Air Force ended. Schaltenbrand told Timmons that he thought he was well qualified to assist TBE with its potential contract for the Mexican Project, and Timmons suggested that Schaltenbrand fill out an application and send it to TBE's personnel department. He also mentioned that Schaltenbrand should discuss with the Air Force any potential conflicts of interest that might arise.

Schaltenbrand sent a resume to TBE's personnel department and also travelled to TBE's offices in Huntsville, Alabama to further discuss the possibility of employment. On the day of his visit to TBE, Schaltenbrand apparently was listed on Air Force records as on "inactive" duty. Schaltenbrand spoke with Timmons about his qualifications, and Timmons explained what TBE was looking for. TBE had done some advertising for the position and was seeking someone to lead TBE's Mexican team. In addition to flight experience, TBE wanted someone who could speak Spanish. Schaltenbrand told Timmons that he had thought about that, and that he would take a course in Spanish in order to be qualified. No salary discussions took place at that time.

Schaltenbrand's sixty-day period of duty ended on July 1, 1987, but he was activated for short periods on several occasions throughout August and September. Although the record is unclear as to the description of his duties during these later periods, it does not appear that he was significantly involved in the Mexican Project. On or about September 21, 1987, Schaltenbrand contacted TBE and informed it that he had another offer of employment, and therefore needed to know whether TBE was going to offer him a job. On September 21, TBE offered him the position that he had discussed with Timmons in April.

On September 24, Schaltenbrand went to the Office of the Staff Judge Advocate of the Air Force, seeking advice as to whether or not there were any conflict of interest rules that would prevent him from accepting a job with TBE. Upon his arrival at the office, he was handed Air Force Form 1175, "Legal Assistance Record" and told to fill out the section entitled "To be completed by client," which he did. The form contained the following statements:

PRIVILEGED INFORMATION—Information placed on this card is privileged. Neither the lawyer nor such paralegal assistants or clerical personnel as may assist in the case will disclose this information to anyone without the express consent of the client. Furthermore, disclosure may not be ordered by superior military authority.

PRINCIPAL PURPOSE(S): To collect data on the number and types of legal assistance cases handled and to help your lawyer recall the type of legal problems previously discussed with you.

DISCLOSURE IS VOLUNTARY: You are not required to complete this card but your failure to do so may result in your not receiving legal assistance service.

After filling out the form, Schaltenbrand spoke to Judge Advocate General ("JAG") attorneys Michael Deep and Michael Shutter. Deep and Shutter explained that they were Deputy Counselors who represented the government. They gave Schaltenbrand various printed materials concerning the conflict of interest statutes and regulations and answered questions for him. The meeting lasted about an hour. When Schaltenbrand asked about specific situations, he was told that due to their status as representatives of the government, they could not answer such questions and he would have to retain his own counsel to discuss them. After this meeting, Schaltenbrand accepted TBE's offer on September 25 and began work on September 28.

In his new capacity as a TBE employee, Schaltenbrand attended a meeting at the Air Force base on November 4, 1987 concerning the Mexican Project. The meeting

was considered a "status conference." At this time, TBE still had not formalized its contract on the project. Dale Weaver was the TBE spokesperson at the meeting and requested that Schaltenbrand accompany him because Schaltenbrand would be responsible for implementing the plans discussed at the meeting. Aside from discussing some delivery schedules, there is no evidence that Schaltenbrand made any other contributions to the meeting.

Schaltenbrand later was investigated for possible violations of the conflict of interest rules. During the investigation, JAG attorneys Deep and Shutter explained to government investigators the nature and the specifics of Schaltenbrand's meeting with them concerning his possible conflict of interest. Schaltenbrand had not consented to these disclosures. He subsequently was convicted.

## DISCUSSION

### Section 208

■ Schaltenbrand first challenges his conviction under 18 U.S.C. § 208(a). That section provides:

[W]hoever, being an officer or employee of the executive branch of the United States Government, ... participates personally and substantially ... in a ... particular matter in which, to his knowledge, he, ... or any person or organization with whom he is negotiating or has any arrangement concerning prospective employment, has a financial interest ... [shall be guilty of a felony].

The parties do not dispute that Schaltenbrand was an officer of the executive branch or that he participated personally and substantially in the Mexican Project. Thus, the only issue with respect to section 208(a) is whether or not his conduct in obtaining his position with TBE amounted to "negotiation" under the statute. Unfortunately, this term is not defined in the statute.

This court recently addressed the definition of "negotiation" under section 208(a) and stated that "the terms 'negotiating' and 'arrangement' are not exotic or abstruse words requiring detailed etymological study or judicial analysis. They are common words of universal usage. People of ordinary intelligence would have fair notice of the conduct proscribed by the statute." *United States v. Hedges*, 912 F.2d 1397, 1403 (11th Cir.1990) (quoting *United States v. Conlon*, 628 F.2d 150, 154 (D.C.Cir.1980), *cert. denied*, 454 U.S. 1149, 102 S.Ct. 1015, 71 L.Ed.2d 304 (1982)).

Not surprisingly, Schaltenbrand urges a rather rigid definition of negotiation. He points to the language in *Black's Law Dictionary*, which states:

Negotiation is process of submission and consideration of offers until acceptable offer is made and accepted. The deliberation, discussion, or conference upon the terms of a proposed agreement; the act of settling or arranging the terms and conditions of a bargain, sale, or other business transaction.

*Black's Law Dictionary* 934 (5th ed. 1979) (citations omitted). Schaltenbrand also points to the jury instruction that was affirmed in *Hedges:*

Negotiation is a communication between two parties with a view to reaching an agreement. Negotiation connotes discussion and active interest on both sides. Preliminary or exploratory talks do not constitute negotiation. Rather, to find a negotiation, you must find that there was a process of submission and consideration of offers.

*Hedges*, 912 F.2d at 1403 n. 2. Schaltenbrand argues that he had submitted an application to TBE, but TBE did not make him an offer until after he was finished with the Mexican Project. Stating that "[n]egotiating is like doing the Tango—there may be some dispute over who is going to lead, but it still takes two," he argues that no negotiations took place because TBE had not yet shown interest on its side.

Schaltenbrand contends that *Hedges* supports his argument that "negotiation" cannot take place until an offer is made. Although the *Hedges* court found that negotiation had taken place, Schaltenbrand notes that in that case the employer had proposed a salary for the prospective employee, and the prospective employee had coun-

tered with a higher salary proposal. *See Hedges*, 912 F.2d at 1403.

Contrary to the interpretation urged by Schaltenbrand, we conclude his actions were not only consistent with the definitions quoted above, but were also consistent with the reasoning in *Hedges*. As an Air Force reserve officer, Schaltenbrand approached TBE about the possibility of employment. TBE responded that he should fill out an application. After submitting an application, he was invited by TBE to come to its offices for an interview. During the interview, Schaltenbrand and TBE discussed the necessary qualifications to fill a particular position. TBE stressed that they needed someone who spoke Spanish. Schaltenbrand replied that he would learn to speak Spanish. Some months later, he received the exact position he had discussed at the interview.

The above circumstances clearly indicate active interest on both sides. The two parties were not engaged in mere general discussions, but had a specific position in mind and discussed the qualifications of the position in detail. Moreover, when TBE suggested that Schaltenbrand did not meet all of the qualifications, he responded that he would remedy that problem. Schaltenbrand contends that because *TBE* did not make a formal offer, no negotiations took place. Here, Schaltenbrand seems to forget his own argument that negotiations "take two"—clearly if it takes two to negotiate, there should not be a requirement as to who must make their offer first. Schaltenbrand initiated the dialogue, and TBE invited him to its offices and pursued the matter further. To require that the statute does not apply until the moment when a formal offer is made is to read the statute too narrowly.

Schaltenbrand asserts, however, that his application and interview cannot be considered an offer to TBE. He stresses that by merely applying for the job, he did not bind himself to accept it. We fail to see

how this takes his actions outside the definition of negotiation. The whole purpose of "negotiation" is for each side to present its position to the other party, in hopes that it can attract the other party to eventually submit to a binding agreement. There is no doubt that Schaltenbrand's purpose in applying and interviewing for a position with TBE was to begin a process that would ultimately lead to a binding employment agreement. In effect, Schaltenbrand was "offering" himself to TBE, hoping that TBE would make an offer on its part.

This reading of the term "negotiate" is consistent with the purpose of the statute. In discussing the history of the statute, the *Hedges* court stated:

> In the seminal case of the *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 548, 81 S.Ct. 294, 308–10, 5 L.Ed.2d 268, 288–89 (1961), in considering Section 208's predecessor statute, 18 U.S.C. § 434, the Supreme Court reviewed the legislative history of the conflict of interest statute. It observed that "[t]he obvious purpose of the statute is to insure honesty in the Government's business dealings by preventing federal agents who have interests adverse to those of the Government from advancing their own interests at the expense of the public welfare." Although the statute, enacted in 1863, has been reenacted several times, "the broad prohibition contained in the original statute has been retained throughout the years."

*Hedges*, 912 F.2d at 1401–02. Despite the Supreme Court's broad reading of the statute, Congress amended the statute in 1962 with the intent to make it even broader. *See United States v. Irons*, 640 F.2d 872, 878 (7th Cir.1981). With regard to the specific term "negotiate," the *Hedges* court found that "[t]he term is to be broadly construed." *Hedges*, 912 F.2d at 1403. Other courts have also reached this conclusion. *See Conlon*, 628 F.2d at 155.[2]

---

**2.** Although we find that "negotiation" should be read broadly, we do not adopt the definition given by the district court in this case. In its oral order, the district court stated that to negotiate "is simply to converse with somebody else;

carry on a conversation about something that you hope to do or intend to do." We hold only that Schaltenbrand's conduct falls under a common understanding of the term "negotiation" as discussed in our analysis above.

Schaltenbrand also argues that if his definition of negotiation is not adopted, the court should at least hold that the term is ambiguous and apply the rule of lenity. Schaltenbrand relies on the recent Supreme Court case of *United States v. Crandon*, 494 U.S. 152, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990), which applied the rule of lenity to another government conflict of interest provision. We simply note that *Hedges*, which was decided several months after *Crandon*, specifically addressed the issue of lenity with respect to the term "negotiate" and found that the term was not ambiguous. Our reasoning above is clearly consistent with the *Hedges* holding on this issue.

*Section 207*

Schaltenbrand also was convicted under 18 U.S.C. § 207(a). Section 207(a) prohibits former officers of the executive branch from knowingly acting "as agent or attorney for, or otherwise represent[ing], any other person (except the United States), in any formal or informal appearance before" any department of the United States in connection with any contract in which the former government employee participated personally and substantially while employed by the government. Again, there is no dispute that Schaltenbrand had been an officer of the executive branch or that he was involved personally and substantially in the Mexican Project.

Although the statute prohibits acting as "agent or attorney for, or otherwise represent[ing]," the indictment in this case stated only that Schaltenbrand "did act as agent" for TBE and failed to allege that he "otherwise represent[ed]" TBE. Based on the language in the indictment, Schaltenbrand could only be convicted of a violation of § 207(a) if the government proved beyond a reasonable doubt that he acted as an agent at the November 4, 1987 meeting. *See United States v. Figueroa*, 666 F.2d 1375 (11th Cir.1982). The term "agent" is not defined in the statute, and we have

discovered no cases interpreting the term as it pertains to the statute.

■■■ Agency is defined as "the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." Restatement (Second) of Agency § 1(1) (1958). The "principal" is "[t]he one for whom action is to be taken," *id.* § 1(2), and the "agent" is "[t]he one who is to act." *Id.* § 1(3). This court has stated that "an essential characteristic of an agency is the power of the agent to commit his principal to business relationships with third parties...." *Griffin v. United States*, 588 F.2d 521, 528 (5th Cir. 1979).[3] An agent has "actual" authority to bind the principal where the principal has specifically granted the agent the power to do so. *See* H.G. Reuschlein & W.A. Gregory, Agency and Partnership § 14 (1979). An agent has "apparent" authority to bind the principal where the principal has held out the agent as having such authority or has permitted the agent to represent that he has such authority. *See Hunt v. Miller*, 908 F.2d 1210, 1216 (4th Cir.1990); *Yohay v. City of Alexandria Employees Credit Union*, 827 F.2d 967, 972–73 (4th Cir.1987); *Trustees of the UIU Health and Welfare Fund v. New York Flame Proofing, Co.*, 828 F.2d 79, 83–84 (2d Cir.1987).

■■■ We will not reverse a conviction for insufficient evidence in a non-jury trial unless, upon reviewing the evidence in the light most favorable to the government, no reasonable trier of fact could find guilt beyond a reasonable doubt. *United States v. Burstyn*, 878 F.2d 1322, 1324 (11th Cir. 1989). The evidence may be sufficient even if it does not exclude every reasonable hypothesis of innocence. *United States v. Lopez*, 898 F.2d 1505, 1509 (11th Cir.1990).

■■■ Our review of the record leads us to conclude that there is insufficient evidence to sustain the government's burden of proving that Schaltenbrand acted as an

---

**3.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (*en banc*), the Eleventh Circuit Court of Appeals adopted as precedent the decisions of the former Fifth Circuit issued before October 1, 1981.

agent for TBE at the November 4 meeting. This case originally was tried before a jury, but the parties later dismissed the jury and entered stipulations as to the remaining facts. Before the jury was dismissed, one witness testified regarding Schaltenbrand's role at the November 4 meeting. Robert T. White testified that he had attended the meeting, and that Schaltenbrand also had attended the meeting and had signed the sign-in sheet. The sign-in sheet was entered into evidence. Next to his name, Schaltenbrand wrote "Teledyne." In addition to testifying that Schaltenbrand was physically present at the meeting and that Schaltenbrand had signed the sign-in sheet, White testified that he recalled Schaltenbrand discussing delivery schedules for the aircraft.

Other than White's testimony, the stipulations entered into by the parties contain the only evidence concerning Schaltenbrand's role at the meeting. The stipulations state the following:

> It is stipulated that the government will present no evidence that the defendant said or did anything at the meeting, other than White's testimony that the defendant talked about a delivery schedule.

> It is stipulated that Weaver from Teledyne Brown Engineering and the defendant will testify that the defendant did not say or do anything at the November 4, 1987, meeting. Weaver will also testify that Weaver was the spokesperson for Teledyne Brown Engineering at the November 4 meeting.

> It is also stipulated that the defendant was asked by Weaver to accompany Weaver to the meeting in order to listen at the meeting because the defendant was to carry out those discussions in Mexico.

The above evidence shows only that Schaltenbrand attended the November 4 meeting as an employee of TBE, and that he did not participate other than to discuss delivery schedules. The government produced no evidence to show that TBE had given Schaltenbrand authority to make any binding decisions on its behalf. Moreover, the government produced no evidence to show that TBE had held out Schaltenbrand as one who could make binding commitments on its behalf or that it had permitted Schaltenbrand to so hold himself out. The government's evidence on this point is especially meager in light of the other stipulations indicating that TBE's spokesperson at the meeting was Weaver, and that Weaver had asked Schaltenbrand to accompany him to the meeting "in order to listen." Based on this record, we reject the government's argument that Schaltenbrand acted as "agent" at the meeting. In light of this holding, we need not address Schaltenbrand's other arguments with respect to section 207(a).

*Attorney–Client Privilege*

■ Schaltenbrand also argues that the attorney-client privilege applies to his discussions with JAG lawyers Deep and Shutter, and therefore evidence obtained from them should have been excluded at trial. The district court accepted briefs on this issue and held an evidentiary hearing at which Schaltenbrand and Deep testified. The district court then denied Schaltenbrand's motion to exclude the evidence. On appeal, "findings of a District Court on a pretrial motion to suppress are binding upon this Court unless they are clearly erroneous." *United States v. Newbern,* 731 F.2d 744, 747 (11th Cir.1984).

At the evidentiary hearing, Schaltenbrand testified that he sought out the JAG attorneys specifically to obtain legal advice and that the attorneys did in fact interpret the law for him. He also confirmed that he had filled out the "Legal Assistance Record," and stated that he did not expect the attorneys to use the information he had given them after he left the office.

Deep testified that he was a supervisory attorney who was responsible for several programs within the JAG office. He explained that under one program, JAG attorneys act as attorney advisors in the Air Force legal assistance program. This program is designed to assist members of the Air Force and their families with a limited range of legal problems. Deep acknowledged that when acting as an attorney

advisor, an attorney-client relationship may arise out of an attorney's discussions with someone. Under another program, JAG attorneys act as Deputy Counselors for Air Force standards of conduct. This program provides standards of conduct "briefings" for members of the Air Force inquiring about potential conflicts of interest. Deep testified that his meeting with Schaltenbrand was such a briefing, and that like all briefings, this one began with a statement that the attorneys represented the government, that they could explain the particular provisions to him, but could not represent him in any way. Schaltenbrand did not deny this, but could not recall what the attorneys had told him in this regard.

Deep also testified that the JAG office used the "Legal Assistance Record" cards for both the legal assistance program and the standards of conduct program. He explained that the Air Force requires that records be kept for both programs, and there is not a separate form for the standards of conduct briefings. Finally, he testified that although the form stated that everything on the form would be confidential, Schaltenbrand was never advised that any of the discussions that occurred after he filled out the form would be confidential.

■ The party invoking the attorney-client privilege has the burden of proving that an attorney-client relationship existed and that the particular communications were confidential. *In re Grand Jury Proceedings in Matter of Freeman*, 708 F.2d 1571, 1575 (11th Cir.1983). In order to show that communications made to an attorney are within the privilege, it must be shown that "the communication was made to him confidentially, in his professional capacity, for the purpose of securing legal advice or assistance." *United States v. Ponder*, 475 F.2d 37, 39 (5th Cir.1973). "The key question in determining the existence of a privileged communication is 'whether the client reasonably understood the conference to be confidential.'" *Kevlik v. Goldstein*, 724 F.2d 844, 849 (1st Cir.1984) (quoting McCormick on Evidence, § 91 at 189 (1972)).

■ In this case, it appears that Schaltenbrand intended to make his communications confidentially for the purpose of securing legal advice. Whether or not the attorneys were acting in their "professional capacity" for purposes of the attorney-client privilege, however, is a more difficult question. In its order denying Schaltenbrand's motion to exclude evidence, the district court stated that "the communications that transpired between Mr. Deeb [sic] and defendant were in Mr. Deeb's [sic] capacity as a Deputy Counselor under Regulation 30.30 and not in the capacity of an attorney giving legal advice through the Legal Assistance Program...." The record reveals that Deep testified that he had informed Schaltenbrand of this circumstance. According to the record, Schaltenbrand did not deny this, but only stated that he did not remember. Thus, the district court's determination that Deep was acting as a Deputy Counselor was not clearly erroneous.

Although we accept as true the fact that Deep was acting as a Deputy Counselor and not an attorney advisor, this does not answer the question of law as to whether a communication to a Deputy Counselor can be within the attorney-client privilege. We conclude that in this case Schaltenbrand's communications were privileged. Schaltenbrand came to the JAG office seeking legal advice. He filled out a card which described him as a client and described the attorneys as his lawyers. The attorneys spent approximately an hour answering his questions and explaining and interpreting statutes and regulations for him. In fact, Deep testified that he told Schaltenbrand never to return to the base in connection with any project he had worked on while in the government. This statement was legal advice. When Schaltenbrand asked specific questions about what would happen if he took a job after leaving the Air Force, he was told that he would have to find his own attorney because the JAG attorneys could not represent him. This reasonably could have been interpreted as meaning that Air Force attorneys could not represent him once he was no longer in the Air Force.

We therefore reject the government's argument that a reasonable non-lawyer would understand the legal significance of speaking to a standards of conduct counselor as opposed to an attorney advisor about matters deemed "privileged" on the government's own form. A contrary result certainly would inhibit other members of the Air Force from seeking the advice of JAG attorneys in order to avoid conflicts of interest.

■ Despite our holding that the testimony of Deep and Shutter was protected by the attorney-client privilege, we conclude that the district court's admission of this evidence was harmless error. At trial before the jury, the government called several witnesses who testified about Schaltenbrand's conduct. Witness McPherson testified as to Schaltenbrand's role in the Mexican Project and the dates of his involvement. Witness Hamlin testified as to Schaltenbrand's Air Force status on the particular dates in question (i.e., active duty, inactive duty, etc.). Witness White testified about Schaltenbrand's role in the Mexican Project and also about his role at the November 4 meeting. Witness Pounds discussed the status of the contract on the various dates at issue. Witness Timmons testified about Schaltenbrand's dealings with TBE, discussing both Schaltenbrand's conduct and that of TBE.

After Timmons's testimony, the jury was dismissed, and the parties entered into a number of stipulations before submitting the case to the court for decision. The stipulations dealt with the dates Schaltenbrand received his offer, accepted his offer, and began work. The stipulations also discussed Schaltenbrand's role at the November 4 meeting, and the role of Dale Weaver. The only evidence in the entire trial having to do with Schaltenbrand's meeting with Deep and Shutter is one stipulation that Deep and Shutter informed Schaltenbrand not to return to the Air Force base on any project he worked on for the Air Force.

This stipulation did not relate to Schaltenbrand's guilt or innocence on the charges of "negotiating" or making an "appearance," but rather was only relevant to his defense of attorney-client privilege. Because we find that the admission of the privileged information was not relevant to the charges, and because of the overwhelming testimony by other witnesses, we hold that the admission was harmless error.[4]

CONCLUSION

In accordance with the above discussion, we AFFIRM the conviction for Count I. We REVERSE the conviction for Count II, direct entry of acquittal, and VACATE the sentence imposed as to that count.

---

4. Schaltenbrand also suggests, relying on *United States v. Morrison,* 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981), and *United States v. Levy,* 577 F.2d 200 (3d Cir.1978), that the indictment should have been dismissed based on communi-

cations by the JAG attorneys to government investigators that were not admitted into evidence at trial. Those cases involved sixth amendment violations and are inapposite here.