Filed 9/30/19

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ROBERT ANDERSON,<br><br>Defendant and Appellant. | B282048<br><br>(Los Angeles County<br>Super. Ct. No. TA138556) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Tammy Chung Ryu, Judge. Affirmed in part and remanded with directions.

Michael Allen and Mark R. Yanis, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

Robert Anderson appeals the judgment entered following a jury trial in which he was convicted of two counts of attempted premeditated murder (Pen. Code,[1] §§ 187, subd. (a)/664; count 1, Tony Rivas, & count 4, Carlos Manzur); two counts of shooting at an occupied motor vehicle (§ 246; counts 2 & 3); conspiracy to commit a crime (dissuading a witness) (§§ 182, subd. (a)(1), 136.1, subd. (a); count 5); and attempting to dissuade a witness (§ 136.1, subd. (a)(2); count 6).  As to both attempted murders the jury found true the allegations that appellant had personally used a firearm (§ 12022.53, subd. (b)) and personally discharged a firearm (§ 12022.53, subd. (c)).  With respect to the attempted murder in count 1, the jury also found true the allegation that the personal and intentional discharge of a weapon caused great bodily injury to Rivas.  (§ 12022.53, subd. (d).)  The trial court sentenced appellant to an indeterminate term of 55 years to life plus a consecutive determinate term of 21 years 8 months.

Appellant contends:  (1) The trial court violated appellant's confrontation rights by preventing defense counsel from confronting Rivas with evidence he was giving false testimony and by admonishing Rivas outside the jury's presence regarding his comportment as a witness; (2) The trial court's failure to instruct the jury on the lesser included offense of attempted voluntary manslaughter violated appellant's constitutional rights, requiring reversal because the error relieved the prosecution of the burden of proving each element beyond a reasonable doubt; and (3) The trial court violated appellant's due process rights when it erroneously instructed the jury pursuant

---

[1] Undesignated statutory references are to the Penal Code.

to CALCRIM No. 315 to consider witnesses' level of certainty in identifying appellant. We disagree and affirm the judgment of conviction.

Appellant further requests this court to conduct an independent review of the trial court's in camera *Pitchess*[2] hearing in his first trial. We have conducted our review and conclude the trial court did not abuse its discretion in ruling there was no discoverable information. Finally, appellant contends, and respondent agrees that, in light of Senate Bill No. 620,[3] the matter must be remanded to allow the trial court to exercise its discretion as to the formerly mandatory firearm enhancements imposed under section 12022.53.

## FACTUAL BACKGROUND

*The attempted murders*

On May 3, 2015, about 11:30 a.m., Tony Rivas parked his red Volkswagen in front of the driveway of the San Pedro Market, blocking the exit from the market's parking lot. Rivas and his passenger, Carlos Manzur, went into the market to make a purchase. When Rivas and Manzur returned to their car, two women in a white Buick whose car was blocked from exiting the parking lot began yelling at Rivas. The women insulted Rivas, calling him a "fucking Mexican"; Rivas responded, "Fucking nigger," and drove away. The white Buick followed Rivas's car at a close distance as Rivas drove north on San Pedro Street. When Rivas made a U-turn at 118th Street, the Buick did the same and continued behind Rivas as he proceeded south on San Pedro.

---

[2] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

[3] Statutes 2017, chapter 682, section 2.

As they drove, Rivas and Manzur saw one of the women in the Buick speaking on a phone. After a few turns, Rivas noticed a white truck behind his car in front of the Buick. The truck followed the Volkswagen to 124th Street, where Rivas stopped near the middle of the road facing Avalon Boulevard. The truck stopped on the passenger side about 8 to 13 feet behind Rivas's car. Rivas testified that the truck was a full size, double cab Chevy pickup truck, which was taller than Rivas's car.

When the vehicles came to a stop on 124th Street, the driver of the truck yelled, "Did you have a problem with my mom?" or words to that effect. Rivas replied, "I don't have a problem with your mother. I don't have a problem with you." The driver then brandished a chrome nine-millimeter handgun[4] and pointed it at the Volkswagen. Rivas pleaded with the driver not to shoot, but as Rivas pulled his car slightly forward, the driver fired the gun through the rear passenger window of the Volkswagen. The bullet broke the window, passed through the Volkswagen's driver's seat, and struck Rivas in the back, causing him to bleed profusely and lose feeling in his legs and feet.[5] The gun appeared to jam as the driver tried to fire a few more times.

---

[4] Police recovered seven .45 caliber bullet casings on 124th Street west of Avalon Boulevard. Although the barrel widths differ, when viewed from the side, a .45 caliber handgun and a nine-millimeter handgun appear virtually indistinguishable.

[5] The bullet that lodged in Rivas's back damaged two of his spinal cord nerves. As a result, Rivas was unable to walk when he was discharged from the hospital, and at the time of trial nearly two years after the shooting he still had no feeling in his right leg, he needed crutches to walk, and he used a wheelchair.

4

The truck then pulled forward, made a U-turn at Avalon Boulevard and drove back toward Rivas's car.  Rivas told Manzur he had been hit and to get out of the car.  Manzur exited the vehicle and ran as several shots were fired in his direction.  As Rivas sat in his car unable to move his legs, the driver of the truck fired twice more at the Volkswagen, striking the driver's side door.

*The shooting at the food truck*

Shirley Diaz Andrade was in her food truck parked on Avalon Boulevard at 124th Street when she heard a gunshot and saw a red car and a white pickup truck behind it on 124th Street.  She saw the truck pull in front of the red car and make a U-turn.  The driver of the truck held a gun outside the window and fired three more times at the red car.  The shooter then pointed his gun toward the food truck and fired.  Andrade dropped to the floor and heard a bullet hit the door of her truck.

*The investigation*

Andrade was unable to identify the driver of the truck but described him as a Black male wearing a white sleeveless T-shirt.  She described the truck as a white four-door Chevy Silverado pickup with a black towing apparatus on the rear.  She memorized the last three digits of the truck's license plate (568).

Using the partial license plate number of the truck provided by Andrade, police located a white GMC pickup truck with the license plate 8X24568 that matched the description of the suspect vehicle.[6]  DMV records showed the truck registered

---

[6] Rivas, Manzur, and Andrade identified that truck as the vehicle used in the shooting.

to appellant, who lived next to the San Pedro Market on 119th Street.

Both Rivas and Manzur identified appellant in a six-pack photo array as the driver of the pickup truck who followed the red Volkswagen and shot at them. Rivas and Manzur also identified appellant as the shooter at the preliminary hearing, in the first trial in October 2016, and at trial.

Surveillance video from the San Pedro Market before the shooting showed Rivas and the occupants of the Buick exchange words in the parking lot, Rivas's execution of a U-turn, and the Buick following the Volkswagen. Another surveillance video from a different angle showed the Buick in the parking lot, the truck parked in front of appellant's house on the street, and appellant wearing a white sleeveless T-shirt speaking with the women in the Buick. After the Buick could be seen driving toward San Pedro Street, the video showed appellant walking through the market parking lot talking on the phone, walking back from the San Pedro Street side of the market, running in the direction of his residence and the truck, and the truck driving away. The video then showed the truck returning from the direction of San Pedro Street sometime later.

*The jail phone calls*

At the preliminary hearing, Rivas testified that a woman had visited his home and told "him not to testify—or come to court." The woman was identified as Amanda Hegarty, whom appellant had called numerous times from jail between November 2015 and January, sometimes using another inmate's booking number to place the calls. Among other things, appellant and Hegarty discussed how Rivas might be persuaded not to testify that appellant was the shooter.

6

*The defense case*

Appellant testified. He admitted the truck belonged to him and agreed that he could be seen in the surveillance video walking across the San Pedro Market parking lot talking on the phone, but he denied driving the truck the morning of May 3, 2015, and he denied that he was the shooter. Rather, appellant explained that his friend Davion had borrowed the truck the night before, and after returning the next morning had driven it off again without permission.

On the morning of the shooting, Davion parked the truck in front of appellant's house but sat in the vehicle for over an hour. Two women came to appellant's house to look at a Chevy Malibu appellant had for sale. Davion was still in the truck as appellant was showing the car to the women, who complained that Davion had not told them there was so much wrong with the car. The women left without purchasing the Malibu and walked back to the white Buick, which was parked in the San Pedro Market parking lot. Appellant followed the women to their car and gave them directions to another person in the neighborhood who sold Saturns for less than appellant was asking for the Malibu. As appellant was walking back in the direction of his house after the women had left, he called the other car seller. In subsequent testimony appellant stated that as he was leaving the parking lot, he was calling his friend, "O," who had recently had a heart attack.

Just as appellant ran back to his house, Davion drove away in appellant's truck.

Rivas lived on 119th Street, a few houses down from appellant on the same side of the street. Rivas was known in the neighborhood as "Happy," and he and appellant were acquainted.

7

Appellant testified that the purpose of the phone calls with Hegarty was to get Rivas to come to court so that Rivas would recognize that appellant was not the man who shot him.

## DISCUSSION

I. **The Exclusion of Rivas's Prior Inconsistent Testimony and the Trial Court's Admonition of Rivas Outside the Jury's Presence**

Appellant contends the trial court violated his confrontation rights by preventing defense counsel from impeaching Rivas with prior inconsistent testimony from the preliminary hearing, which would have demonstrated Rivas was giving false testimony at trial. Although erroneous, we conclude the court's limitation on this impeachment was harmless beyond a reasonable doubt. Appellant further contends that by admonishing Rivas outside the jury's presence, the trial court improperly prevented the defense from demonstrating Rivas's hostile demeanor under questioning, thereby violating appellant's right to confront this key witness. However, having failed to object on this or any ground, appellant forfeited the claim.

A. *The erroneous limitation on the impeachment of Rivas was harmless beyond a reasonable doubt*

*1. Relevant background*

At the preliminary hearing the prosecutor asked Rivas what he saw when the white truck was stopped. Rivas responded, "I saw the gun. It got stuck and he was making it unstuck. I saw that he had the gun outside, and I thought it was a policeman and I thought he's gonna kill me." The court sustained defense counsel's objection that the testimony was nonresponsive and granted the request to strike it.

8

At trial Rivas denied testifying previously that he believed the shooter was a police officer, proclaiming, "No.  No.  I never said that.  No.  Why would I accuse him of being a police officer when he confronted me that if I had had a problem with his mother or with him?  Why would I confuse someone that was going to kill me with a police officer?  No.  No.  No."  When defense counsel sought to impeach Rivas with his preliminary hearing testimony, the prosecutor requested a sidebar conference.

At sidebar the trial court observed, "It looks like that portion of the testimony was stricken."  Defense counsel pointed out that the objection had been sustained because the testimony was nonresponsive.  The trial court then ruled that defense counsel could ask Rivas if he had testified he thought the shooter was a police officer, but he could not refer to the preliminary hearing transcript because Rivas's answer had been stricken and "should have been struck from the record."  The trial court explained, "If it's stricken, then you cannot refer to it.  And I don't know exactly how the court reporter's supposed to do it.  If it's stricken, it's supposed to be—not appear on the record in the transcript."

When cross-examination resumed, defense counsel asked Rivas, "Your testimony is you have never said in court that you thought the person who was shooting at you was a police officer?"  The trial court then sustained the prosecutor's objection on the ground that the question had been "asked and answered."

*2.  The trial court erred in preventing the defense from impeaching Rivas with his prior inconsistent statement, but the error was harmless beyond a reasonable doubt*

The trial court incorrectly reasoned that the portion of Rivas's preliminary hearing testimony which was stricken had

9

ceased to exist and therefore could not be used for impeachment. To the contrary, although Rivas's statement was inadmissible for its truth as prior *testimony*, Rivas nevertheless spoke the words— "I thought it was a policeman and I thought he's gonna kill me"— and those words were admissible to impeach Rivas's trial testimony that he never made such a statement. (*People v. Corella* (2004) 122 Cal.App.4th 461, 470, 471 [witness's "words were stricken as testimony but continued to constitute her 'statement,' " admissible for impeachment].)

Assuming without deciding that the trial court's improper limitation on impeachment infringed appellant's confrontation rights, the error does not warrant reversal in this case.

" ' "Confrontation clause violations are subject to federal harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24." [Citation.] We ask whether it is clear beyond a reasonable doubt that a rational jury would have reached the same verdict absent the error.' " (*People v. Livingston* (2012) 53 Cal.4th 1145, 1159; *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 395.) " 'The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.' " (*People v. Greenberger* (1997) 58

Cal.App.4th 298, 350, quoting *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 684.)

Applying these factors to the instant case, we find the court's error was harmless.

Rivas's testimony was central to the prosecution's case, and he was subjected to extensive cross-examination. He was also impeached numerous times with prior inconsistent statements as well as with a prior conviction for possession of cocaine for sale in the 1980's. Inconsistencies in Rivas's account of the incident, his willingness to deny giving testimony that plainly appeared on the record of prior proceedings, and Rivas's belligerence under cross-examination were on full display throughout Rivas's testimony. In one such instance, after testifying that before May 3, 2015, he had seen appellant driving the white truck past his house, Rivas was impeached with his preliminary hearing testimony that he had never seen appellant or his truck before the day of the shooting. Not only did Rivas contradict his prior testimony, but he denied ever making such a statement. At other points Rivas was impeached with prior testimony about the sequence of events when Rivas exchanged insults with the women in the Buick, when he first saw the white truck following him, and with prior testimony that he was never afraid because he was a "beast" and a "bad ass."

The prosecution presented fairly compelling evidence that appellant was the shooter. Apart from the excluded statement that he thought the shooter was a police officer, Rivas positively identified appellant as the shooter from a photo six-pack before trial, at the preliminary hearing, and at trial. Rivas's testimony was consistent with Manzur's, who also identified appellant as the shooter from a photo line-up before trial, at the preliminary

11

hearing, and at trial. The evidence established that appellant owned the truck used in the shooting, and appellant, who could be seen on surveillance video wearing a white tank top, matched Andrade's description of the shooter as African-American and wearing a white sleeveless shirt. The surveillance video also showed appellant speaking to the two women in the Buick, walking through the market parking lot with a phone to his ear, and then running in the direction of his residence and truck. Immediately thereafter the truck could be seen driving away.

Finally, appellant testified that he was not the shooter, offering his friend Davion as the likely culprit. The jury was not required to accept appellant's account, however. Indeed, a rational trier of fact could disbelieve any portions of appellant's testimony that it deemed self-serving and draw any contrary inferences supported by the evidence. (*People v. Silva* (2001) 25 Cal.4th 345, 369; *People v. Ewing* (2016) 244 Cal.App.4th 359, 378; see *U.S. v. Selby* (9th Cir. 2009) 557 F.3d 968, 976 [" '[d]isbelief of a defendant's own testimony may provide at least a partial basis for a jury's conclusion that the opposite of the testimony is the truth' "].)

Under these circumstances, we conclude that the trial court's improper limitation on Rivas's impeachment to be harmless beyond a reasonable doubt. (*People v. Brown* (2003) 31 Cal.4th 518, 546.)

**B. *Appellant forfeited any claim based on the trial court's admonition of Rivas outside the presence of the jury***

*1. Relevant background*

Defense counsel's cross-examination of Rivas frequently elicited rambling nonresponsive answers and outbursts, prompting the court to admonish Rivas on multiple occasions.

12

Finally, Rivas declared, "I don't even want to answer anymore because those questions are not worth it anymore."  At this, the court promptly took a break and admonished Rivas outside the presence of the jury:

"You have been subpoenaed to testify as a witness whether you like it or not.  And as a witness [the] only job you have is to answer the questions.  You may not understand . . . why these questions are being asked.  But that is not a reason for you to get frustrated or not answer the questions. . . . You have to answer the questions.  [¶]  And you're making it go longer and longer by trying to just say what you want to say instead of answering the questions.  You need to answer the questions the attorneys are asking whether you like the question or not."  "My observation is, when you don't like the question, you start saying something else.  Or you're going ahead and trying to anticipate what the question is going to be.  But that's not what you can do as a witness in the case."  The court added, "I don't want to keep stopping you because I've already done it several times.  I don't like to do that with a witness.  Because I don't want the jurors to have any— develop any opinions just because they see me interrupting you."

2. *Because appellant did not object below the claim is forfeited*

Appellant did not object to the court admonishing Rivas outside the jury's presence at all, much less on the ground that the procedure violated his right to confrontation.  Hence, the claim is forfeited.  (*People v. Smith* (2001) 24 Cal.4th 849, 852 ["As a general rule, only 'claims properly raised and preserved by the parties are reviewable on appeal' "].)

## II. The Trial Court Had No Sua Sponte Duty to Instruct on Attempted Voluntary Manslaughter Based on Heat of Passion

Appellant contends the trial court erred in omitting instruction on attempted voluntary manslaughter on the basis of its mistaken belief that attempted voluntary manslaughter is not a lesser included offense of attempted murder.  According to appellant, the trial court had a sua sponte duty to instruct the jury on attempted voluntary manslaughter based on heat of passion, and its failure to do so violated appellant's Sixth Amendment right to have the jury decide every element of the offense.  We disagree.

### A. *The trial court's duty to instruct*

It is settled that in a criminal case, even absent a request, "a trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence. [Citation.]  It is error for a trial court not to instruct on a lesser included offense when the evidence raises a question whether all of the elements of the charged offense were present, and the question is substantial enough to merit consideration by the jury."  (*People v. Booker* (2011) 51 Cal.4th 141, 181; *People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).)

However, " '[a]n instruction on a lesser included offense must be given only if there is substantial evidence from which a jury could reasonably conclude that the defendant committed the lesser, uncharged offense, but not the greater, charged offense.' " *People v. Nelson* (2016) 1 Cal.5th 513, 538 (*Nelson*).)  "The 'substantial evidence requirement is not satisfied by " '*any* evidence . . . no matter how weak' " ' " (*ibid*.), and "[s]peculative, minimal, or insubstantial evidence is insufficient to require an

instruction on a lesser included offense" (*People v. Simon* (2016) 1 Cal.5th 98, 132). "On appeal, we review independently the question whether the trial court improperly failed to instruct on a lesser included offense." (*People v. Souza* (2012) 54 Cal.4th 90, 113.)

**B.** ***Attempted voluntary manslaughter as a lesser included offense of attempted murder***

" 'Murder is the unlawful killing of a human being . . . with malice aforethought.' (§ 187, subd. (a).) 'Manslaughter is the unlawful killing of a human being without malice.' (§ 192, subd. (a).) Manslaughter is a lesser included offense of murder, and a defendant who commits an intentional and unlawful killing but who lacks malice is guilty of voluntary manslaughter. Heat of passion is one of the mental states that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter." (*Nelson*, *supra*, 1 Cal.5th at p. 538; *Breverman*, *supra*, 19 Cal.4th at p. 154.) Just as voluntary manslaughter is a lesser included offense of murder, so too is attempted voluntary manslaughter a lesser included offense of attempted murder. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137 ["the offense of attempted murder is reduced to the lesser included offense of attempted voluntary manslaughter when the defendant acted upon a sudden quarrel or in the heat of passion"]; see *People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708–709.)

Our Supreme Court has explained: "A heat of passion theory of manslaughter has both an objective and a subjective component. [Citations.] [¶] ' "To satisfy the objective or 'reasonable person' element of this form of voluntary manslaughter, the accused's heat of passion must be due to

15

'sufficient provocation.' " ' " (*People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*).) Legally sufficient provocation is that which " 'causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation.' [Citation.] Further, the 'proper standard focuses upon whether the person of average disposition would be induced to react from passion and not from judgment.' " (*Nelson*, *supra*, 1 Cal.5th at p. 539.)

"For purposes of the heat of passion doctrine, 'provocation is sufficient not because it affects the quality of one's thought processes, but because it eclipses reflection. A person in this state simply reacts from emotion due to the provocation, without deliberation or judgment.' [Citation.] The standard requires more than evidence that a defendant's passions were aroused. The facts and circumstances must be ' "sufficient to arouse the passions of the ordinarily reasonable man." ' " (*Nelson, supra*, 1 Cal.5th at p. 539.)

As for the subjective element of voluntary manslaughter based on provocation, the high court has explained that the defendant "must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation." (*Moye*, *supra*, 47 Cal.4th at p. 550; *Nelson, supra*, 1 Cal.5th at p. 539.) The court has emphasized that "[i]t is not sufficient that a person 'is provoked and [then] *later* kills.' " (*Nelson*, at p. 539.) Rather, where " ' "sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter." ' " (*Moye*, *supra*, 47 Cal.4th at p. 550, quoting *Breverman, supra*, 19 Cal.4th at p. 163.)

**C.** *Substantial evidence did not support instruction on attempted voluntary manslaughter in the present case*

Appellant's claim fails because there was insufficient evidence in this case to support either the objective or the subjective element of attempted voluntary manslaughter based on heat of passion.

Appellant argues that Rivas's use of the words "fucking nigger" during the verbal altercation with the two women in the Buick "might easily have provoked an ordinary reasonable [B]lack man in this neighborhood to act rashly and without deliberation, and from passion rather than judgment." However, the objective standard is not the reaction of a reasonable Black man in appellant's neighborhood. As our Supreme Court has long held in determining whether a provocation meets the objective standard for voluntary manslaughter, "no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused." (*People v. Logan* (1917) 175 Cal. 45, 49; *People v. Cole* (2004) 33 Cal.4th 1158, 1215–1216 [same]; see *People v. Enraca* (2012) 53 Cal.4th 735, 759 (*Enraca*) ["standard is not the reaction of a 'reasonable gang member' "]; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144 [passion for revenge will not reduce murder to manslaughter].)

In this regard, appellant's reliance on *People v. Millbrook*, *supra*, 222 Cal.App.4th 1122 is misplaced. There, the victim had been aggressive throughout the night of the party and had made threatening statements and engaged in shouting matches with other guests before arguing with the defendant. (*Id*. at p. 1141.) Immediately before the shooting, the victim escalated the fight with the defendant, and with his fists clenched, lunged at the defendant, who then shot him. (*Ibid*.) The appellate court held

17

this evidence sufficient to permit a jury to conclude that a reasonable person in the defendant's position could have acted in the heat of passion, thus warranting instruction on voluntary manslaughter. (*Id*. at pp. 1141–1143.)

Here, by contrast, Rivas insulted two women outside of appellant's presence,[7] but did not threaten or engage in any physical violence. In such situations, our Supreme Court has repeatedly rejected arguments that insults "would induce sufficient provocation in an *ordinary* person to merit an instruction on voluntary manslaughter." (*Enraca*, *supra*, 53 Cal.4th at p. 759; *People v. Gutierrez* (2009) 45 Cal.4th 789, 826 (*Gutierrez*) ["a voluntary manslaughter instruction is not warranted where the act that allegedly provoked the killing was no more than taunting words"]; *People v. Avila* (2009) 46 Cal.4th 680, 706 [gang challenge insufficient provocation]; *People v. Manriquez* (2005) 37 Cal.4th 547, 586 [name calling and taunting defendant to use weapon insufficient provocation].) In short, a provocation, " 'such as words of reproach, however grievous they may be, . . . is not recognized as sufficient to arouse, in a reasonable man, such passion as reduces an unlawful killing with a deadly weapon to manslaughter.' " (*People v. Wells* (1938) 10 Cal.2d 610, 623.)

Not surprisingly, appellant does not even argue that the subjective component of heat of passion was satisfied here. Not only was evidence completely lacking that appellant shot at Rivas

---

[7] There is no evidence to support appellant's statement that either of these women was appellant's "loved one," much less the speculation that appellant might have witnessed the exchange.

and Manzur " 'while under "the actual influence of a strong passion" induced by [objectively sufficient] provocation' " (*Enraca, supra*, 53 Cal.4th at p. 759), but appellant's state of mind was never in issue or argued by the defense.  Indeed, appellant presented evidence completely at odds with a heat of passion defense:  He averred that he had never seen the women before, he refuted that either was a relative of his, he denied receiving a phone call from any woman telling him she had just been called a "nigger," and he categorically denied any knowledge of the altercation in the parking lot or any name-calling between Rivas and the women.  In short, appellant vehemently denied any involvement with the shooting, suggesting instead that his friend Davion had taken appellant's truck and shot Rivas.

In light of this defense, the only issue at trial on the attempted murder charges was appellant's identity as the shooter.  " 'A trial court need not, however, instruct on lesser included offenses when the evidence shows that the defendant is either guilty of the crime charged or not guilty of any crime (for example, when the only issue at trial is the defendant's identity as the perpetrator).  Because in such a case "there is no evidence that the offense was less than that charged" [citation], the jury need not be instructed on any lesser included offense.' " (*Gutierrez, supra*, 45 Cal.4th at pp. 825–826.)  As another court explained, "When defendant denied he shot the [victim], none of the alleged evidence of heat of passion . . . was of the type 'that a reasonable jury could find persuasive.' [Citation.]  Simply stated, the duty to instruct on inconsistent defenses does not extend to cases such as this where the sworn testimony of the accused completely obviates any basis for finding a lesser included offense." (*People v. Sinclair* (1998) 64 Cal.App.4th 1012, 1021–

19

1022; *People v. Gutierrez, supra,* 112 Cal.App.4th at p. 709 ["Generally, when a defendant completely denies complicity in the charged crime, there is no error in failing to instruct on a lesser included offense"].)

### III. CALCRIM No. 315

Appellant contends the trial court denied his due process rights by instructing pursuant to CALCRIM No. 315 that a witness's level of certainty is a factor to consider in evaluating the accuracy of identification testimony. Appellant argues that this portion of the instruction is contrary to empirical studies that show witness certainty has no correlation with accuracy and is legally incorrect. This precise issue is currently pending before the California Supreme Court in *People v. Lemcke*, review granted October 10, 2018, S250108 (*Lemcke*).

CALCRIM No. 315 directs the jury in evaluating eyewitness identification testimony to consider a number of questions, including, "How certain was the witness when he or she made an identification?" Respondent contends appellant forfeited any challenge to the instruction by failing to object. The predecessor to CALCRIM No. 315 is CALJIC No. 2.92, which tells the jury to consider any factor that "bear[s] upon the accuracy of the witness' identification of the defendant, including, . . . [¶] . . . [¶] [t]he extent to which the witness is either certain or uncertain of the identification." At the time of trial in this case, the California Supreme Court had upheld the inclusion of the certainty factor in CALJIC No. 2.92 on at least two occasions. (*People v. Sánchez* (2016) 63 Cal.4th 411, 461–463 (*Sánchez*); *People v. Johnson* (1992) 3 Cal.4th 1183, 1231–1232; see *People v. Wright* (1988) 45 Cal.3d 1126, 1144 [upholding CALJIC No. 2.92 in its entirety, including the certainty factor].) Given this

20

precedent we reject respondent's forfeiture argument as any objection to the certainty factor in CALCRIM No. 315 would have been futile.  (See *People v. Penunuri* (2018) 5 Cal.5th 126, 166; *People v. Anderson* (2001) 25 Cal.4th 543, 587 ["Counsel is not required to proffer futile objections"].)

However, the same precedent mandates that we reject appellant's claim on its merits.  In approving the use of certainty as a factor in evaluating eyewitness identifications, our Supreme Court has recently explained:  "Studies concluding there is, at best, a weak correlation between witness certainty and accuracy are nothing new.  We cited some of them three decades ago to support our holding that the trial court has discretion to admit expert testimony regarding the reliability of eyewitness identification.  [Citation.]  In *People v. Wright* (1988) 45 Cal.3d 1126, 1141, we held 'that a proper instruction on eyewitness identification factors should focus the jury's attention on facts relevant to its determination of the existence of reasonable doubt regarding identification, by listing, in a neutral manner, the relevant factors supported by the evidence.'  We specifically approved CALJIC No. 2.92, including its certainty factor.  (*Wright*, at pp. 1144, 1166 [appendix].)  We have since reiterated the propriety of including this factor.  (*People v. Johnson* (1992) 3 Cal.4th 1183, 1231–1232.)"  (*Sánchez, supra*, 63 Cal.4th at p. 462.)

Our Supreme Court is now considering whether the certainty factor as articulated in CALCRIM No. 315 remains valid.  In its grant of review in *Lemcke*, the high court framed the issue as follows:  "Does instructing a jury with CALCRIM No. 315 that an eyewitness's level of certainty can be considered when evaluating the reliability of the identification violate a

21

defendant's due process rights?"
(<https://appellatecases.courtinfo.ca.gov/search/case/mainCaseScr
een.cfm?dist=0&doc_id=2257737&doc_no=S250108&request_toke
n=NiIwLSIkTkw2WyBNSCMtWEpIUFQ0UDxTJiJeQzpRMCAg
Cg%3D%3D&bck=yes> [as of Sept. 20, 2019], archived at
<https://perma.cc/R9SE-5PUM>.)

Appellant "trusts" that in *Lemcke* our Supreme Court will invalidate CALCRIM No. 315 to the extent it encourages the jury to consider a witness's certainty in making an identification, and asks us to anticipate that outcome in this case. *Sánchez*, however, remains good law. Unless and until the Supreme Court changes that law, we are bound by its holding that including the certainty factor in instructions on eyewitness identification is not error. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

## IV. *Pitchess*

Prior to the first trial the trial court granted a defense motion under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*) for a review of the personnel records of Detective Sanchez, the Spanish-speaking detective who assisted and translated when Manzur was interviewed by police. Following an in camera review of the requested records to determine if they contained evidence of misconduct involving "misstating the evidence, preparing false police reports, lying, [or] untruthfulness," the trial court found no discoverable information.

Appellant asks this court to conduct an independent review of the in camera hearing on the *Pitchess* motion. Respondent contends that appellant forfeited the right to independent review on appeal because he failed to renew his *Pitchess* motion before

the second trial.  However, assuming the request is not forfeited, respondent does not oppose an independent review by this court.

Because, as appellant points out, nothing in Detective Sanchez's personnel file had changed since the trial court found it contained no discoverable information, there was no basis for the defense to renew its *Pitchess* motion prior to the second trial, and no reasonable likelihood of a different outcome.  To hold appellant forfeited appellate review of the *Pitchess* ruling in these circumstances would require an idle act by the defense and a pointless exercise by the trial court.  The law does not require idle acts.  (Civ. Code, § 3532; *People v. Financial Casualty & Surety, Inc.* (2016) 2 Cal.5th 35, 48.)

We have reviewed the sealed record of the in camera proceedings and conclude the trial court satisfied its obligations in determining whether the requested records contained discoverable information.  No abuse of discretion occurred.  (See *People v. Mooc* (2001) 26 Cal.4th 1216, 1225.)

## V. In Light of Senate Bill No. 620, the Matter Must Be Remanded to Enable the Trial Court to Exercise Its Discretion to Impose or Strike the Firearm Enhancements

The jury found true all five of the firearm enhancement allegations, and appellant's sentence includes a consecutive indeterminate term of 25 years to life under section 12022.53, subdivision (d) and a consecutive determinate term of 20 years pursuant to section 12022.53, subdivision (c).  The parties agree that in light of Senate Bill No. 620, the matter must be remanded to allow the trial court to exercise its discretion as to these formerly mandatory firearm enhancements.

23

On October 11, 2017, the Governor signed Senate Bill No. 620. (2017–2018 Reg. Sess.) Previously, section 12022.53 required the imposition of specified sentencing enhancements based on a true finding that the defendant personally and intentionally discharged a firearm in the commission of a felony (§ 12022.53, subd. (c)) or personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)). The trial court had no discretion to strike any applicable enhancement. (Prior § 12022.53, subd. (h).) The legislation amends section 12022.53, subdivision (h) to remove the prohibition on striking a firearm enhancement, and allows the court "in the interest of justice pursuant to Section 1385 and at the time of sentencing, [to] strike or dismiss an enhancement otherwise required to be imposed by this section." (Stats. 2017, ch. 682, § 2.)

Senate Bill No. 620 took effect on January 1, 2018, and the amendment to section 12022.53 applies retroactively to nonfinal judgments under the rule of *In re Estrada* (1965) 63 Cal.2d 740, 745. (*People v. Chavez* (2018) 22 Cal.App.5th 663, 712 ["amended section 12022.53, subdivision (h) applies to all nonfinal judgments"].) Therefore, because the judgment of conviction in appellant's case was not final when Senate Bill No. 620 took effect, appellant is entitled to the benefits of the amendments to section 12022.53.

At appellant's sentencing in this case, the trial court gave no indication whether it would strike the firearm enhancements had it been aware of any discretion to do so. In such instances, remand for a new sentencing hearing is required. (*People v. Almanza* (2018) 24 Cal.App.5th 1104, 1110 ["[r]emand is required unless the record reveals a clear indication that the trial court

24

would not have reduced the sentence even if at the time of sentencing it had the discretion to do so"]; *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425 [same].)  Remand is therefore appropriate here to allow the trial court to exercise its discretion as to whether to strike or impose the firearm enhancements in accordance with section 12022.53, subdivision (h).

## DISPOSITION

The judgment of conviction is affirmed.  The matter is remanded with directions that the trial court exercise its discretion with respect to imposition of the firearm enhancement under Penal Code section 12022.53.

NOT TO BE PUBLISHED.

LUI, P. J.

We concur:

CHAVEZ, J.

HOFFSTADT, J.

25